IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT HAUGHIE,

*Plaintiff*,

v.

WEXFORD HEALTH SOURCES, INC., *et al.*,

*Defendants*.

Civil Action No. ELH-18-3963

## MEMORANDUM OPINION

Plaintiff Robert Haugie, a Maryland prisoner, filed a civil rights suit, through counsel, under 42 U.S.C § 1983, alleging constitutionally inadequate medical care with respect to diagnosis of a brain tumor. ECF 1 (the "Complaint"). He has sued multiple defendants, known and unknown. They include Wexford Health Sources, Inc. ("Wexford"); Q. Mallory, R.N.; Charles Williams III; Mary Rockefeller, N.P.; Michael Smith; Marian Peters, R.N.; Newman Azubuike; Electa Awanga;[1] Melaku Ayalew, M.D.; Yonas Sisay, M.D.; Hiruy Bishaw, M.D.; P.A. Emmanuel; and Doe Defendants 1-10.[2]

The Complaint contains six causes of action, which I shall denominate as counts. Count I, alleging "Deprivation of Eighth Amendment Right to Medical Care," is lodged against all defendants. *Id.* ¶¶ 58-76. Count II, against Wexford, alleges "Policy & Practice of Denial of

---

[1] Haugie refers to Awanga as an "attending nurse." ECF 1, ¶ 25. Defendants contend that she "is now a nurse practitioner" but was a registered nurse in November and December of 2015. ECF 17 at 1 n.1.

[2] Haugie also sued the Maryland Department of Public Safety and Correctional Services ("DPSCS"). By Memorandum (ECF 35) and Order (ECF 36) of December 2, 2019, I dismissed the suit as to the DSPCS.

Medical Care." *Id.* ¶¶ 77-91. Count III, filed against all defendants, asserts violations of Articles 24 and 25 of the Maryland Declaration of Rights. *Id.* ¶¶ 92-96. Count IV asserts a claim against all defendants for intentional infliction of emotional distress. *Id.* ¶¶ 97-103. Count V is styled as "Respondeat Superior" and is lodged against Wexford. *Id.* ¶¶ 104-106. And, Count VI seeks "Indemnification" as to Wexford. *Id.* ¶¶ 107-110.

The docket reflects that defendants Williams and Emmanuel were served. ECF 4. But, they have not responded to the suit.

Four motions are pending. Mallory, Awanga, Smith, Ayalew, Sisay, Peters, Bishaw, Azubuike, and Rockefeller (collectively, the "Individual Medical Defendants") have moved to dismiss under Fed. R. Civ. P. 12(b)(6) (ECF 17), supported by a memorandum of law (ECF 17-1) (the "Motion to Dismiss"). Wexford, which has answered the suit (ECF 5), has moved for judgment on the pleadings under Rule 12(c) (ECF 20), supported by a memorandum (ECF 20-1) (the "Wexford Motion"). Defendants have also moved to bifurcate the pattern and practice or "*Monell*" claim in Count II, and to stay *Monell* discovery. ECF 21. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). It is supported by a memorandum (ECF 21-1) (the "Motion to Bifurcate"). Plaintiff opposes the Motion to Dismiss (ECF 26), the Wexford Motion (ECF 22), and the Motion to Bifurcate. ECF 25. Defendants have filed replies as to the Motion to Bifurcate (ECF 27); the Wexford Motion (ECF 28); and the Motion to Dismiss. ECF 29.

Plaintiff has moved to amend the Complaint (ECF 30-1, the "Motion to Amend").[3] Defendants oppose the Motion to Amend. ECF 32. Plaintiff has replied in. ECF 34.

---

[3] In filing the Motion to Amend, Haugie failed to comply with Local Rule 103.6. It requires the movant, *inter alia*, to submit a version of the amended pleading that shows the deletions and additions. According to Haugie, the only change to the Complaint is the addition of Count VII, which adds a claim for medical malpractice against all defendants, including DPSCS. ECF 30-1.

No hearing is necessary to resolve the motions. See Local Rule 105.6. For the reasons that follow, I shall grant the Motion to Amend. I shall deny the Wexford Motion as premature. I shall deny as moot the Motion to Dismiss, because that motion is directed to the original Complaint, which is superseded by the amended Complaint. And, I shall grant the Motion to Bifurcate.

## I.        Factual and Procedural Background

Haugie is a Maryland prisoner incarcerated at "JCI." ECF 1, ¶ 10. He alleges that on November 11, 2015, he "began to experience painful and debilitating headaches that refused to subside." *Id.* ¶ 31. These headaches affected his "balance, appetite, speech, alertness, vision, and continence and caused him to become dizzy." *Id.* ¶ 33.

Haugie's symptoms persisted until December 24, 2015, when he was hospitalized. *Id.* ¶ 32. At that time, he was diagnosed with a benign brain tumor. *Id.* ¶ 34. He underwent surgery a few days later, on December 28, 2015, at Johns Hopkins Hospital. *Id.* ¶ 54.

Wexford, a private company "hired by DPSCS to provide medical services to those who, like Plaintiff, are incarcerated in the Department of Corrections," was responsible for plaintiff's medical care during the relevant time. *Id.* ¶ 12. In November and December 2015, when Haughie's symptoms first appeared and persisted, he saw several Wexford health care providers.

On November 19, 2015, Haugie was seen by Charles Williams III, an attending nurse. *Id.* ¶¶ 23, 35. Although plaintiff allegedly reported his persistent headaches, he claims that Williams "failed to accurately report Plaintiff's symptoms on the medical records that would be viewed by other providers responsible for Plaintiff's care." *Id.* ¶ 35. Haugie alleges that Yonas Sisay, an attending physician at JCI (*id.* ¶ 18), recorded Haugie's headaches and dizziness "as early as December 2, 2015, but no differential diagnosis was performed nor was any appropriate treatment provided." *Id.* ¶ 36. The next day, Sisay "continued" Haugie's existing prescriptions for Neurontin

and Fioricet. *Id.* ¶ 37. Smith again observed Haugie on December 5, 2015, but again "failed to record any of Plaintiff's complaints related to his debilitating headaches and dizziness or provide any treatment for Plaintiff's condition whatsoever." *Id.* ¶ 38.

Haugie saw Mary Rockefeller, an attending nurse practitioner, on December 14, 2015. *Id.* ¶¶ 26, 39. According to plaintiff, Rockefeller also failed to record his symptoms. *Id.* ¶ 39. Smith saw Haugie on December 20, 2015, but again did not record his symptoms. *Id.* ¶ 40. Between December 20 and December 22, Haugie claims he could not eat or walk. *Id.* ¶ 41. Haugie went to inmate health services on December 22, 2015, where he was seen by Rockefeller. *Id.* ¶ 42. She "noted that Plaintiff appeared tired, semi-asleep, and was having difficulty talking." *Id.*

On the same date, Marian Peters, an attending nurse, and Newman Azubuike, also an attending nurse, "observed that Plaintiff appeared very drowsy, had slow quiet speech, and was unsteady walking." *Id.* ¶¶ 21, 24, 43. They also noted that plaintiff's blood pressure was elevated, he was and unsteady in walking, and had reported vomiting, dizziness, and a headache. *Id.* ¶ 44.

Haugie maintains his condition was "drastically worse" than what was reported by defendants at the time. *Id.* ¶ 45. He alleges that at the time, he was "experiencing neurological damage from the growth of a brain tumor which caused extreme headaches, extreme disorientation, loss of motor function in his legs and hands, and extreme pain and suffering." *Id.*

During this time, a physician's assistant, identified as "P.A. Emmanuel," prescribed Motrin for Haugie. *Id.* ¶¶ 19, 46. However, no emergency treatment was provided, nor was a doctor called to evaluate plaintiff. *Id.* ¶ 47.

On December 23, 2015, defendant reported his symptoms to Melaku Ayalew, an attending physician, and Electa Awanga, an attending nurse. *Id.* ¶¶ 16, 25, 49. Haugie alleges that Ayalew and Awanga "falsely reported that Plaintiff was no longer experiencing headaches or

disorientation, or lack of motor function, and decided Plaintiff did not need to be referred for any further treatment." *Id.* ¶ 49.

The following day, December 24, 2015, Haugie reported his "unabated" symptoms to Hiruy Bishaw, an attending physician. *Id.* ¶¶ 17, 50. Haugie alleges that Bishaw "falsely reported that Plaintiff was no longer experiencing headaches, disorientation, or lack of motor function, and decided that Plaintiff did not need to be referred for any further treatement." *Id.* ¶ 50. Haugie's "pain and distress increased during this time" because he was not receiving appropriate treatment. *Id.* ¶ 51.

That day, a medical staff member noted that Haugie "was unable to move his left leg, had numbness in his left hand, no normal movement in [his] right hand, and had abdominal pain going through chest to shoulder." *Id.* At that point, Wexford staff called an ambulance and Haugie was transported to Baltimore Washington Medical Center. *Id.* ¶ 53. There, Haugie received a CT scan, which revealed the brain tumor. *Id.* He was subsequently transferred to Johns Hopkins Hospital, where he underwent surgery to remove the brain tumor on December 28, 2015. *Id.* ¶¶ 53, 54.

Plaintiff claims that his surgery was "complicated by increased intracranial pressure from the undiscovered and undiagnosed brain tumor." *Id.* ¶ 54. Moreover, he alleges that he "currently suffers from a long term to permanent difficulty swallowing, walking, and talking. *Id.* ¶ 55.

Haughie filed suit in federal court on December 21, 2018. Also on December 21, 2018, Haugie filed a medical malpractice claim with the Maryland Health Care Alternative Dispute Resolution Office ("HCADRO"). He named the Individual Medical Defendants and Wexford, but not DPSCS. ECF 32-1. And, it was not until July 1, 2019, that he filed with the HCADRO the required Certificate of Qualified Expert and the expert's report. The Certificate is dated December 9, 2018. ECF 32-2. The expert's report, titled "Supplemental Report," is dated January 19, 2019.

*Id.* The Certificate and report are authored by Anthony Chin-Quee, M.D., a board-certified physician in Otolaryngology. *Id.*

Haugie filed his Motion to Amend on September 25, 2019. ECF 30-1. The proposed amended Complaint (ECF 30) adds a new claim (Count VII) against all defendants for medical malpractice, including the DPSCS. Notably, the DPSCS was previously dismissed from the case. In sum, plaintiff asserts that the standard of care required defendants to have sent Haugie to a specialist upon learning of his symptoms. ECF 30, ¶¶ 112-119.

Additional facts are included, *infra*.

## II.    Discussion

### A.  Wexford's Motion for Judgment on the Pleadings

Fed. R. Civ. P. 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."

Wexford has filed an answer to the Complaint. ECF 5. However, the Individual Medical Defendants have not yet filed answers. Instead, they have moved to dismiss. *See* ECF 17. Therefore, the Wexford Motion under Rule 12(c) is premature.

Numerous cases indicate that a Rule 12(c) motion is premature if filed before all defendants have answered the suit. *See*, *e.g.*, *Guthrie v. Nw. Mut. Life Ins. Co.*, No. DKC 09-2342, 2010 WL 3260001, at *4 (D. Md. Aug. 18, 2010) ("'A motion for judgment on the pleadings is plainly inappropriate here, because the pleadings have not been closed by answers from all defendants.'") (quoting *Little v. Fed. Bureau of Investigation*, 793 F. Supp. 652, 653 (D. Md. 1992), *aff'd,* 1 F.3d 255 (4th Cir. 1993) ) (alteration omitted); *see also Garvey v. Seterus, Inc.*, No. 5:16-CV-00209-RLV, 2017 WL 2722307, at *13 (W.D.N.C. June 23, 2017) (denying defendant's motion for judgment on the pleadings under Rule 12(c) as premature because some of the parties "had not

filed answers to Plaintiff's Complaint when [one of the defendants] moved for judgment on the pleadings"); *Scottsdale Ins. Co. v. Doe*, 7:13-CV-00342, 2014 WL 3778510, at *3 (W.D. Va. July 30, 2014) ("[T]he pleadings are not closed because defendant Manges has not filed an answer to Scottsdale's complaint and no party has requested that default judgment be entered against him. Therefore, a remedy under Rule 12(c) is not available."); *Nationwide Children's Hosp., Inc. v. D.W. Dickey & Son, Inc. Employee Health & Welfare Plan*, 2:08-CV-1140, 2009 WL 5247486, at *1 (S.D. Ohio Dec. 31, 2009) ("[T]he pleadings are not closed until all defendants have filed an answer, even when one defendant has filed a motion to dismiss instead of answering.").

Accordingly, I shall deny the Wexford Motion as premature.

### B. Plaintiff's Motion to Amend

### 1.

As noted, this suit was filed on December, 21 2018. ECF 1. On September 25, 2019, plaintiff filed the Motion to Amend, pursuant to Fed. R. Civ. P. 15. ECF 30-1. In particular, plaintiff seeks to amend his Complaint to add a count of medical malpractice against all defendants. ECF 30, ¶¶ 112-19.

A complaint may be amended "once as a matter of course" within twenty-one days of service of a defendant's answer or Rule 12(b), (e), or (f) motion, "whichever is earlier." Fed. R. Civ. P. 15(a)(1)(b). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, the court "should freely give leave when justice so requires." *Id. See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Simmons v. United Mortg. & Loan Inv.*, LLC, 634 F.3d 754, 769 (4th Cir. 2011).

Under Rule 15(a), the district court has "broad discretion concerning motions to amend pleadings." *Booth v. Maryland*, 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam); *see also*

*Foman*, 371 U.S. at 182; *Laber v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc). A district court may deny a motion to amend for reasons "'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'" *Booth*, 337 F. App'x at 312 (quoting *Foman*, 371 U.S. at 182). However, "[d]elay alone is an insufficient reason to deny leave to amend." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999). "Rather, the delay must be accompanied by prejudice, bad faith, or futility." *Id.* (citation omitted); *see Simmons*, 634 F.3d at 769; *Equal Rights Center v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010).

"Perhaps the most important factor listed by the [Supreme] Court for denying leave to amend is that the opposing party will be prejudiced if the movant is permitted to alter a pleading." 6C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1487 at 701 (3d ed.) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971); *United States v. Hougham*, 364 U.S. 310 (1960)). The burden of showing prejudice falls on "the party opposing amendment." *Atl. Bulk Carrier Corp. v. Milan Exp. Co.*, 3:10-cv-103, 2010 WL 2929612, at *4 (E.D. Va. July 23, 2010). And, "if the court is persuaded that no prejudice will accrue, the amendment should be allowed." WRIGHT & MILLER, § 1487 at 701.

The case of *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423 (4th Cir. 2011), is informative. There, the Court said, *id.* at 439: "'Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing.... [T]he further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant....'" (quoting *Laber*, 438 F.3d at 427) (alteration in *Laber*).

In reviewing a motion to amend, the court must examine the facts of each case "to determine if the threat of prejudice is sufficient to justify denying leave to amend." WRIGHT & MILLER, § 1487 at 701. To be sure, "prejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party, but that basis for a finding of prejudice essentially applies where the amendment is offered shortly before or during trial." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). In contrast, "[a]n amendment is not prejudicial ... if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." *Laber*, 438 F.3d at 427 (emphasis added).

However, a proposed amendment must not be futile. *See Foman*, 371 U.S. at 182. According to the Fourth Circuit, a proposed amendment should be denied as futile "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson*, 785 F.2d at 510; *see also* WRIGHT & MILLER § 1487 ("[A] proposed amendment that clearly is frivolous, advancing a claim or defense that is legally insufficient on its face,[ ] or that fails to include allegations to cure defects in the original pleading,[ ] should be denied."). A motion to amend can also be denied on the basis of futility where the proposed amendment "could not withstand a motion to dismiss." *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995); *see also Devil's Advocate, LLC v. Zurich Am. Ins. Co.*, 666 F. App'x. 256, 267 (4th Cir. 2016) (per curiam) (affirming district court's denial of leave to amend on the basis of futility, because the amended complaint would not survive a motion to dismiss under Rule 12(b)(6)); *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420–21 (4th Cir. 1990) ("There is no error in disallowing an amendment when the claim sought to be pleaded by amendment plainly would be subject to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).").

But, the review for futility "is not equivalent to an evaluation of the underlying merits of the case. To the contrary, '[u]nless a proposed amendment may clearly be seen to be futile because of substantive or procedural considerations, ... conjecture about the merits of the litigation should not enter into the decision whether to allow amendment.'" *Next Generation Grp., LLC v. Sylvan Learning Ctrs.*, LLC, CCB-11-0986, 2012 WL 37397, at *3 (D. Md. Jan. 5, 2012) (quoting *Davis v. Piper Aircraft Corp.*, 615 F.2d, 606, 613 (4th Cir. 1980)).

I pause to note that the proposed medical malpractice claim does not invoke federal question jurisdiction under 28 U.S.C. § 1331. Nor is diversity jurisdiction apparent in this case. See 28 U.S.C. § 1332. But, this Court could exercise supplemental jurisdiction over the malpractice claim under 28 U.S.C. § 1367(a). This provision grants district courts "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[4]

## 2.

As to Fed. R. Civ. P. 15, plaintiff argues that there is no prejudice to the defendants, because discovery has not yet begun and he has simply added another theory of recovery with respect to the same set of operative facts. ECF 34 at 3.

Defendants do not contend that the amendment would be prejudicial. Rather, they urge the Court to deny leave to amend on the ground of futility. In their view, the proposed amendment could not withstand a motion to dismiss. *See Perkins*, 55 F.3d at 917. Defendants' futility argument is premised on the contention that the malpractice claim is subject to dismissal because

---

[4] In the circumstance in which courts dismiss all federal claims, the courts are often inclined to dismiss, without prejudice, a sole remaining state law claim, rather than retain supplemental jurisdiction. *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

plaintiff failed to comply with several requirements of Maryland's Health Care Malpractice Claims Act ("HCMCA" or the "Act"), Maryland Code (2013 Repl. Vol., 2019 Supp.), Courts & Judicial Proceedings Article ("C.J."), § 3–2A–01 *et seq.*

The Act establishes procedures for all "claims, suits, and actions ... by a person against a health care provider for medical injury allegedly suffered by the person in which damages . . . are sought." C.J. § 3–2A–02(a)(1). The Act is intended "to weed out" non-meritorious medical malpractice claims and reduce the costs of litigation. *Wilcox v. Orellano*, 443 Md. 177, 184, 115 A.3d 621, 625 (2015); *see Walzer v. Osborne*, 395 Md. 563, 582, 911 A.2d 427 (2006); *see also Barber v. Catholic Health Initiatives, Inc.*, 180 Md. App. 409, 951 A.2d 857 (2008).

Of import here, the HCMCA provides the process that a claimant must follow as a prerequisite to filing suit. Before filing suit, the claimant must first file a claim with the HCADRO, an administrative body established by the Act. C.J. § 3–2A–04(a)(1)(i). *See Alvarez v. Md. Dept. Of Corr.*, PX-17-141, 2018 WL 1211533, at *8 (D. Md. Mar. 8, 2018) (stating that a medical malpractice claim must first be submitted to the HCADRO as a condition precedent to filing a medical malpractice suit). Within 90 days of filing that claim, the claimant must submit a certificate of a qualified expert, along with a report of the attesting expert, setting forth the alleged departure from the standard of care and proximate cause. C.J. § 3–2A–04(b)(1), (3).

Defendants who contest liability must file their own expert certificate and report, attesting to compliance with the standard of care. It is due within 120 days of the claimant's filing. C.J. § 3–2A–04(b)(2), (3).

The expert report is "an integral part" of the certificate; "the failure to attach an expert report is tantamount to filing no certificate at all." *Wilcox*, 443 Md. at 185, 115 A.3d at 625; *see Walzer*, 395 Md. at 578–79, 911 A.2d 427. The requirement is a vehicle "to reduce the number of

frivolous claims by requiring the parties to substantiate the merit of their claims and defenses early in the process." *Wilcox*, 443 Md. at 185, 115 A.3d at 625; *see also Carroll v. Konits*, 400 Md. 167, 199–201, 929 A.2d 19 (2007) (stating that expert certificate requirement was "intended to curtail frivolous malpractice claims").

A claimant who has filed an expert certificate and report may then proceed with arbitration or waive arbitration and file suit. *See* C.J. § 3–2A–06B. A party who waives arbitration "shall file a complaint and a copy of the election to waive arbitration in the appropriate [Maryland] circuit court or the United States District Court." C.J. § 3-2A-06B(f)(1); *see Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir. 1989) ("Most critically, the precondition [of arbitration] itself must be enforced by [federal] courts.").

Of relevance here, when a claimant fails to timely file an expert certificate and report, the suit is subject to dismissal, without prejudice. C.J. § 3–2A–04(b)(1)(i); *see Wilcox*, 443 Md. at 185, 115 A.3d at 625; *Walzer*, 395 Md. at 578–79, 911 A.2d 427. The Maryland Court of Appeals stated in *Breslin v. Powell*, 421 Md. 266, 290 n. 20, 26 A.3d 878, 893 n. 20 (2011):

> [T]he Certificate is an "indispensable" step in the arbitration process such that arbitration cannot occur without the filing of a proper certificate. Because a claim cannot be in circuit court without meeting all of the requirements for arbitration laid out in CJP § 3–2A–04, including filing a Certificate, filing of a proper certificate is a condition precedent to filing an action in circuit court.... Therefore, if a proper Certificate has not been filed, the case should not have been in court in the first place and should be dismissed without prejudice in accordance with the HCMCA.

Notably, to avoid the prospect that a claim dismissed without prejudice for failure to file a timely certificate might thereafter be barred by limitations, the statute includes several provisions for extending the period of time for filing the expert certificate and report. *Wilcox*, 443 Md. at 185, 115 A.3d at 626.

If the claimant fails to file the certificate and the report within the 90-day period, and the limitations period applicable to the malpractice claim has expired in the interim, but "the failure to file the certificate was neither willful nor the result of gross negligence," then "the panel chairman or the court shall grant an extension of no more than 90 days for filing the certificate. . . ." C.J. § 3-2A-04(b)(1)(ii). Maryland courts appear to treat the 90-day extension under C.J § 3-2A-04(b)(1)(ii) as automatic. *See, e.g.*, *Wilcox*, 443 Md. at 188-89, 115 A.3d at 627; *see also McCready v. Memorial Hosp. v. Hauser*, 330 Md. 497, 510, 624 A.2d 1249, 1256 (1993) (concluding that the 90-day extension is "granted automatically in lieu of dismissal, subject to a defendant's motion to dismiss on the grounds that the claimant's failure to file the expert certificate within the first 90 days was grossly negligent or willful," and the 90-day extension runs from "the expiration of the first 90-day period.").

Another savings provision is found in C.J. § 3-2A-04(b)(5). It states: "An extension of time allowed for filing a certificate of a qualified expert under this subsection shall be granted for good cause shown." *See Kearney v. Berger*, 182 Md. App. 186, 200, 957 A.2d 682, 690 (2008).

In *Wilcox*, the Maryland Court of Appeals summarized the statutory vehicles in the Act that enable a claimant to avoid the bar of limitations that might otherwise follow a dismissal without prejudice for failure to timely file an expert certificate. In the absence of these provisions, a dismissal without prejudice could be transformed, in effect, to one with prejudice. The *Wilcox* Court explained, 443 Md. at 185 n.8, 115 A.3d at 626 n.8.

> The Legislature has provided "three distinct, but complementary, escape valves." *Navarro-Monzo v. Washington Adventist Hosp.*, 380 Md. 195, 204, 844 A.2d 406 (2004). First, although CJ § 3-2A-04(b)(1)(i) requires the expert certificate and report to be filed within 90 days from the date the claim is filed, that deadline will automatically be extended another 90 days if the statute of limitations expires during the initial 90 days and the failure to file a certificate during that period was neither willful nor the result of gross negligence. CJ § 3-2A-04(b)(1)(ii); *McCready Memorial Hosp. v. Hauser*, 330 Md. 497, 508, 624 A.2d

1249 (1993) (holding that the 90-day extension commences without the necessity of request upon the expiration of the initial 90-day period). Second, the Director of HCADRO (or an arbitration panel chairman [or the court]) must grant an extension for filing an expert certificate upon a showing of good cause. CJ § 3-2A-04(b)(5). Third, both the HCADRO Director and an arbitration panel chairman have general discretion to extend time limitations in CJ § 3-2A-04, which would include the time for filing the expert certificate, for good cause shown. CJ § 3-2A-05(j).

Under Maryland law, a civil action ordinarily shall be filed within three years from the date of accrual of the claim, unless another limitations provision applies. C.J. § 5-101. A medical malpractice claim must be filed within the earlier of five years from the date the injury occurred or three years from the date the injury was discovered. C.J. § 5-109(a). The filing of a claim with the HCADRO, in accordance with C.J. § 3-2A-04, constitutes the filing of an action for statute of limitations purposes. *Wilcox*, 443 Md. at 186, 115 A.3d at 626. And, relevant to this case, when a civil action or claim has been dismissed for failure to file a certificate of qualified expert or expert report, C.J. § 5-119(d) provides a limited exception to the limitations bar. C.J. § 5–119 states:

(a)      *Scope*. — (1) This section does not apply to a voluntary dismissal of a civil action or claim by the party who commenced the action or claim.

(2) This section applies only to a civil action or claim that is dismissed once for failure to file a report in accordance with § 3–2A–04(b)(3) of this article.

(b) *Refiling of claim after dismissal*.— If a civil action or claim is commenced by a party within the applicable period of limitations and is dismissed without prejudice, the party may commence a new civil action or claim for the same cause against the same party or parties on or before the later of:

(1) The expiration of the applicable period of limitations;

(2) 60 days from the date of the dismissal; or

(3) August 1, 2007, if the action or claim was dismissed on or after November 17, 2006, but before June 1, 2007.

As the *Wilcox* Court explained, "if a claimant timely commences a medical malpractice claim within the period of limitations and the claim is dismissed without prejudice for failure to

file an expert report, the claimant has up to 60 days to file a new civil action for the same cause against the same parties, even if the statute of limitations has otherwise run in the interim." *Wilcox*, 443 Md. at 187, 115 A.3d at 626.

In sum, it is clear that failure to timely file a certificate or expert report is not necessarily fatal to a medical malpractice claim.

**3.**

As noted, Haugie filed his complaint with the HCADRO on December 21, 2018. ECF 32-1. Therefore, his expert report and certification were due by March 21, 2019. Yet, he did not file them until July 1, 2019. And, the parties indicate that the HCADRO did not dismiss the claim. *See* ECF 32 at 5.

The events detailed in Haugie's suit took place between November 2015 and the end of December 2015. The precise date on which limitations expired is disputed by the parties. *See* ECF 17-1 at 15-17; ECF 26 at 14-15. But, at least with regard to some portion of the malpractice claim, it was timely filed with the HCADRO. And, it appears that limitations expired before the 90-day deadline for the filing of the certificate and the expert report, pursuant to C.J. § 3-2A-04(b)(1)(i).[5]

Haughie did not file his expert certification and report until July 1, 2019. ECF 32-2. Under C.J. § 3-2A-04(b)(1)(ii), Haugie's time to file his expert certification and report would have been

---

[5] In the Motion to Dismiss, the Individual Medical Defendants stated that the statute of limitations is governed by "Maryland's 3-year, general personal injury limitations period. . . ." ECF 17-1 at 15-16; *see* C.J. § 5-101. They argue that plaintiff's claim is not governed by C.J. § 109, because "he did not comply with the conditions precedent under Maryland's Health Care Malpractice Claims Act before filing this action in court. . . ." ECF 17-1 at 15-16 n.13. In his opposition, Haugie contends that limitations did not begin to run until December 28, 2015, when he underwent surgery. ECF 26 at 14.

extended another 90 days, to June 19, 2019, if his failure to file was not willful or due to gross negligence.

According to defendants, on June 20, 2019, the "Director of HCADRO should have dismissed Haugie's action sua sponte. . . but instead took no action." ECF 32 at 5. Then, on August 5, 2019, Haughie waived arbitration. ECF 30-1, ¶ 2; ECF 30-2. C.J. § 3-2A-06B(b)(1) states: ". . . [A]ny claimant may waive arbitration at any time after filing the certificate of qualified expert required by § 3-2A-04(b) of this subtitle by filing with the director a written election to waive arbitration signed by the claimant or the claimant's attorney of record in the arbitration proceeding." And, C.J. § 3-2A-06B(d)(1) provides: "A waiver of arbitration by any party under this section may be filed not later than 60 days after all defendants have filed a certificate of qualified expert under § 3-2A-04(b) of this subtitle."

Nevertheless, defendants assert that C.J. § 3-2A-04-b(1)(i) is unambiguous, and requires that "a claim or action. . .shall be dismissed, without prejudice, if the claimant or plaintiff fails to file a certificate of a qualified expert with the director attesting to a departure from standards of care. . . ." ECF 32 at 5. Thus, they insist that the amendment is futile, because the medical malpractice claim is subject to dismissal. And, they argue that Haugie would not be able to argue that he had good cause for the untimely filing pursuant to C.J. § 3-2A-04(b)(5). In their view, the unexplained delay between December 9, 2018, when Haugie's expert signed the certification and report, and July 1, 2019, when Haughie filed them with the HCADRO, forecloses any argument that the delay in filing was due to anything other than neglect. ECF 32 at 5-6.

In his reply, Haugie failed to address good cause. Nevertheless, whether plaintiff qualifies for relief is not something that I can determine on this record, or at this juncture.

Plaintiff relies on *Logue v. Patient First Corp.*, 246 F. Supp. 3d 1124 (D. Md. 2017). The *Logue* Court granted a motion to amend a complaint to include a medical malpractice claim that was filed with the HCADRO after the plaintiff filed his initial complaint in federal court. *Id.* at 1128. *Logue* does not advance plaintiff's position. There, the plaintiff "followed the HCADRO procedures" and satisfied the condition precedent to suit. *Id.* at 1127.

But, Haugie also points to the savings provisions under Maryland law. As noted, the Act permits an extension for "good cause shown." C.J. §3-2A-04(b)(5). And, C.J. § 5-119 allows a plaintiff to commence a new civil action for the same cause against the same party or parties, if the original complaint was timely filed but is dismissed, without prejudice, for failure to file an expert certificate and report. In that circumstance, the plaintiff has "60 days from the date of dismissal" to file a new claim, even if limitations has expired. C.J. § 5-119(b)(2).

Plaintiff avers that, in light of the savings clause, his amendment is not futile because, even if the Court dismisses the medical malpractice claim due to the untimely filing of the Certificate, he will have a 60-day window in which to refile. ECF 34 at 2-3. In his view, granting the Motion to Amend would conserve judicial economy by avoiding the delay of waiting for the claim to be re-filed, only to end up back in federal court. *Id.* at 3. And, he contends that he should be afforded the opportunity to test his claim on the merits. *Id.*

Haugie's claim of medical malpractice may be subject to dismissal for failure to timely file the expert certificate and report. But, the medical malpractice claim is not necessarily futile. If the Motion to Amend is granted, but the claim is then dismissed, without prejudice, Haugie would be able to take advantage of the 60-day savings provision, by which he could refile his medical malpractice claim, "unless there is a showing of bad faith." C.J. § 3-2A-04(b)(4)(iv). This determination cannot be made on this record, or at this juncture.

Defendants also complain that Haugie "never bothered to serve the Medical Defendants with process in the HCADRO claim. And, Haugie has still not served the Medical Defendants" with Dr. Chin-Quee's certification and report. ECF 32 at 2. C.J. § 3-2A-04(b)(1)(i)(2) states: "The claimant or plaintiff shall serve a copy of the certificate on all other parties to the claim or action or their attorneys of record in accordance with the Maryland Rules. . . ." Defendants claim that they "obtained their copy of the certificate and report by copying it from HCADRO's file." ECF 32 at 2 n.1. This is a fact-based contention that I cannot resolve, given the posture of the case.

Further, defendants argue that Haugie's expert, Dr. Chin-Quee, is not a qualified expert. ECF 32 at 6. Dr. Chin-Quee is board certified in the field of Otolaryngology. ECF 32-2, ¶ 2. Dr. Chin-Quee characterizes otolaryngology as "including disorders of the ears, nose, oral cavity, throat, airway, neck, hearing, and balance." *Id.* at 5. He notes in his report: "The attached certificate provides my education, knowledge, skill and training with regard to the initial assessment, evaluation, stabilization, and treatment of a patient suffering from a balance disorder, such as Mr. Haugie." *Id.* However, the Individual Medical Defendants are all general practitioners. Thus, defendants argue that Dr. Chin-Quee is not board certified in the same field, and therefore he is "not qualified to testify or sign a certificate of qualified expert with regard to the standard of care owed by any of the Defendants." ECF 32 at 7.

Plaintiff counters that Dr. Chin-Quee is board-certified in a "related specialty." ECF 34 at 4. He contends that the test for "related specialty" is whether there is a procedure common to both specialties. *Id.* In his view, this procedure is the examination of a patient presenting with "symptoms pertaining to dizziness and imbalance." *Id.* at 5.

C.J. § 3-2A-02(c)(2)(ii)(1) provides:

In addition to any other qualifications, a health care provider who attests in a certificate of a qualified expert or testifies in relation to a proceeding before a panel or court concerning a defendant's compliance with or departure from standards of care:

> A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; and

> B. Except as provided in subsubparagraph 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant.

This section requires that a qualified expert who is "board certified in a specialty. . . be board certified in the same or related specialty as the defendant." *Id.* In determining what qualifies as a "related subfield," Maryland courts look to whether there is sufficient "overlap" between the "areas of concern" of the two health care practitioners being compared. *Chaplin v. University of Maryland Medical System Corp.*, 2019 WL 5488457, at *2 (Ct. Sp. App. Oct. 25, 2019). In *DeMurth v. Strong*, 205 Md. App. 521, 544 (2012), the Court concluded that specialties can be related if the treatment they provide or a procedure they undertake overlap. *See also Jones v. Bagalkotakar*, 750 F. Supp. 2d 574, 581 (D. Md. 2010) (focusing on the procedure at issue and concluding that a pediatrician's field was sufficiently related to that of a internist/emergency care physician).

Plaintiff contends that the procedure at issue is assessing a patient who presents with balance issues. ECF 34 at 5. The Individual Medical Defendants were alleged to have assessed Haughie's balance. At this stage, the specialty appears sufficiently related to that of the Individual Medical Defendants for the purposes of the Motion to Amend.

Defendants also complain that Dr. Chin-Quee's report fails to identify Bishaw, Mallory, Peters, and Azubuike by name. Therefore, they argue that "Haugie cannot be permitted to amend

his complaint to include a medical negligence claim" against them.  ECF 32 at 7.[6]  The relevant section of Dr. Chin-Quee's expert certification reads, ECF 32-2, ¶ 7:

> It is my opinion, within a reasonable degree of medical probability, that Yonas Sisay, MD, Michael Smith, RN, Mary Rockefeller, NP, Electa Awanga, RN, Melaku Ayalew, MD, and Emmanuel, PA, departed from the applicable standard of medical care owed to Mr. Robert Haugie by failing to: 1) sufficiently document a thorough history, physical examination, differential diagnosis, and plan for the chief complaint of vertigo; 2) follow up on the resolution, worsening, or improvement of his symptoms in subsequent office visits; and 3) transfer the patient to the Emergency Room in a timely fashion once the patient presented with symptoms concerning for a life-threatening cause of his pathology.

Dr. Chin-Quee's report similarly does not name Williams, Bishaw, Mallory, Peters, or Azubike.  However, it does detail deficiencies in the care Haugie received from November 11, 2015, through December 24, 2015, a time frame that includes encounters with the defendants not explicitly named.  *Id.* at 6.  And, Haugie's complaint, filed with HCADRO, names Mallory, Williams, Sisay, Rockefeller, Peters, Azubuike, Awanga, Ayalew, and Bishaw.  ECF 32-1 at 1-3.

Notably, Haugie did not respond to this argument in his opposition.  Thus, he has waived opposition to that argument.  *See Stenlund v. Marriot Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point."); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (same).  Because the argument is waived, Haugie will not be permitted to amend his Complaint to add the medical malpractice claim as to Williams, Bishaw, Mallory, Peters, or Azubike.

As noted, plaintiff includes DPSCS as a defendant in Count VII of the proposed amended Complaint.  However, DPSCS was previously dismissed from the suit.  *See* ECF 35; ECF 36.  Of significance, plaintiff did not name DPSCS in his complaint with the HCADRO.  Nor has plaintiff

---

[6] Defendants omit Williams from the list of people Dr. Chin-Quee has not explicitly named in his certification and report.

added any allegations to the proposed amended suit that would overcome the basis of the court's earlier dismissal. Therefore, plaintiff may not include DPSCS as a defendant in Count VII.

Claims should be litigated on their merits. Because it is in the interests of justice, not prejudicial to the defendants, and not necessarily futile, I shall grant Haugie's Motion to Amend to include the medical malpractice claim. But, I shall grant such leave only as to defendants Sisay, Smith, Rockfeller, Awanga, Ayalew, and Emmanuel.

### C. Motion to Dismiss

As noted, the Individual Medical Defendants have moved to dismiss. ECF 17. That motion is directed to the original Complaint. ECF 1. However, I have granted leave to amend the Complaint.

It is well settled that an amended complaint supplants and supersedes an earlier filing. "[A]n amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (citing 6 Charles Alan Wright, Arthur Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1476 (2d ed. 1990)) ("A pleading that has been amended ... supersedes the pleading it modifies ..."). Therefore, I shall deny the Motion to Dismiss, as moot, without prejudice to the defendants' right to refile the motion as to the Amended Complaint.

### D. Motion to Bifurcate

### 1.

As noted, Wexford has answered the Complaint. ECF 5. Although Wexford's motion for judgment on the pleadings is denied, as premature, and Haughie will be permitted to amend his suit to add the malpractice claim, thereby mooting the motion to dismiss filed by the Individual

Medical Defendants, I will resolve the Motion to Bifurcate at this juncture, in the interest of advancing the litigation.

Defendants seek to bifurcate Haugie's *Monell* Claim against Wexford, pursuant to Fed. R. Civ. P. 42(b). ECF 21-1. Fed. R. Civ. P. 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Notably, "[o]nly one of these criteria need be met to justify bifurcation." *Saxion v. Titan-C-Mfg., Inc.,* 86 F.3d 553, 556 (6th Cir. 1996) (citations omitted).

Further, defendants seek to stay discovery relating to the *Monell* Claim until after the resolution of the § 1983 claim against the Individual Medical Defendants. ECF 21-1. They rely on Fed. R. Civ. P. 26(d), which provides, in pertinent part: "A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, **or by court order.**" (Emphasis added).

Defendants argue that Haugie "cannot recover against Wexford under § 1983 without first proving that one of the Individual Medical Defendants injured him through deliberate indifference to his medical needs." ECF 21 at 2. In their view, if Haugie is unable to show that one of the Individual Medical Defendants was deliberately indifferent to his medical needs, Wexford cannot be held liable. *Id.* at 4. Bifurcation, according to defendants, would maximize judicial economy by allowing the Court to avoid trial preparation on a *Monell* claim before knowing whether it needs to be tried. *Id.* at 2. Further, defendants contend that bifurcation will "ensure that the Individual Medical Defendants receive a fair trial, untainted by unduly prejudicial evidence" regarding

Wexford.  *Id.* at 2-3.  And, defendants contend that discovery regarding the *Monell* claim will be extremely costly and time consuming.  *Id.* at 7.

Haugie opposes the Motion to Bifurcate.  ECF 25.  He contends that whether Wexford argues that "its employees willfully deviated from its policies in treating Plaintiff or that the individual Defendants were actually following Wexford policy," bifurcation is "plainly unwarranted."  *Id*. at 5.  In the first scenario, according to Haugie, Wexford would effectively have admitted that the Individual Medical Defendants were deliberately indifferent.  *Id.*  In the second scenario, Wexford's policy would have motivated the actions of the Individual Medical Defendants, and thus two separate trials would be duplicative.  *Id.* at 6.

Further, Haugie argues that the Seventh Amendment would prevent a second jury from assessing whether Wexford's policies motivated the conduct of the Individual Medical Defendants because it would be unable to revisit the conduct of the individuals.  *Id.* at 7-8.  Haugie also contends that much of the discovery in the *Monell* claim may be solicited through depositions and reports that Wexford was required to file with the State.  *Id.* at 8-9.  And, he argues that the Court can manage potential prejudice if the claims are tried together.  *Id.* at 10-11.

In reply, defendants concede "the infinitesimally minute possibility that Haugie could recover on his *Monell* claim without recovering against one of the Individual Medical Defendants." ECF 27 at 4.  But, they maintain that a second trial would not have to reconsider either the conduct of the Individual Medical Defendants or any damages against them; those would be assessed by the first jury, and the conduct and potential damages against Wexford would be considered by the second.  *Id.* at 5-6.  And, defendants disagree with Haugie's optimistic view of the cost of discovery.  *Id.* at 6-8.

**2.**

District courts have "broad discretion in deciding whether to bifurcate claims for trial, and the exercise of that discretion will be set aside only if clearly abused." *Beasley v. Kelly*, DKC-10-0049, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010) (citing *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1443 (4th Cir. 1993), *cert. denied*, 510 U.S. 915 (1993)); *see also Brown v. Bailey*, RDB-11-1901, 2012 WL 2188338, at *4 (D. Md. June 13, 2010) (same); *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 539 (D. Md. 1995) (same); 9A C. WRIGHT & A. MILLER, FED. PRACTICE AND PROCEDURE, § 2388 (3d ed. 2019) ("Wright & Miller"), at 113-14 ("It is well-established by a wealth of case law that ultimately the question of whether to conduct separate trials under Rule 42(b) should be, and is, a matter left to the sound discretion of the trial court on the basis of the circumstances of the litigation before it.").

Resolution of the Motion to Bifurcate requires a brief review of 42 U.S.C. § 1983, which is the vehicle for many of plaintiff's claims. Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir. 2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied,* 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who

has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that

the official acted personally to deprive the plaintiff of his rights); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

A municipality is subject to suit under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). In the seminal case of *Monell*, the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Id.* at 690-91; *see also*

*Love-Lane*, 355 F.3d at 782.  But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 384 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id*., at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers.  *See, e.g.*, *Atkins*, 487 U.S. at 49; *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL 4581327, at *7 (D. Md. Sept. 1, 2016).  Standards applicable to municipalities are applicable to private corporations acting under color of state law.  *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

A viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights.  *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S.

397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).

In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010). As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983."

A plaintiff who seeks to impose § 1983 liability "on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001). A plaintiff may demonstrate the existence of an official policy in three ways: (1) a

written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997).

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). However, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.* Moreover, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).

In *Owens*, 767 F.3d at 402, the Fourth Circuit made clear that to establish a *Monell* claim on the basis of pattern and practice, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*).

Bifurcation is common in § 1983 cases in which claims are asserted against individual defendants and their municipal employers. Courts have consistently found that "bifurcation

of . . . *Monell* supervisory claims from the individual claims is appropriate and often desirable."

*Brown*, RDB-11-1901, 2012 WL 2188338, at *4; *see also James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 762 (D. Md. 2006); *Robertson v. Prince George's Cnty.,* 215 F. Supp. 2d 664, 665 (D. Md. 2002). In the ordinary course, before determining whether a plaintiff has established a claim for municipal liability under *Monell*, the court must first "determine whether the complaint states a claim for a predicate constitutional violation." *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

Generally, a plaintiff's § 1983 claims "hinge on his ability to show that [individual defendants] violated his constitutional rights." *Id.*; *see also Young*, 238 F.3d at 579 (recognizing that a municipality can only be liable under § 1983 if the plaintiff establishes that a municipal employee violated his constitutional rights); *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) ("A claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised."), *cert. denied*, 502 U.S. 1095 (1992); *Burgess v. Balt. Police Dep't*, RDB-15-0834, 2016 WL 1159200, at *1 (D. Md. Mar. 23, 2016) ("Under 42 U.S.C. § 1983, a municipality or employer cannot be held vicariously liable based solely on an agency relationship."); *Williamson v. Prince George's Cnty.*, DKC-10-1100, 2011 WL 1065780, at *2 (D. Md. Mar. 21, 2011) ("A municipality can only be held liable under § 1983 if the plaintiff first establishes that some county employee violated his constitutional rights."); *Marryshow v. Town of Bladensburg*, 139 F.R.D. 318, 319 (D. Md. 1991) ("Under Section 1983, to hold the [supervisor and municipal] Defendants liable, Plaintiff must first establish that at least one [individual] Defendant violated his constitutional rights.").

Thus, *Monell* claims "are good candidates for bifurcation because when no governmental employees are found liable, no subsequent trial of the municipality is necessary." *Beasley*, DKC-10-0049, 2010 WL 3221848, at *3. Put another way, "[b]ecause of the secondary nature of a municipality on potential liability under § 1983, courts have frequently bifurcated discovery and or trial so that cases proceed first with a trial against the individual defendant(s) alleged to be primarily liable." *Taylor v. Maryland*, DKC-10-2167, 2010 WL 5247903, at *2 (D. Md. Dec. 16, 2010); *see Burgess*, RDB-15-0834, 2016 WL 1159200, at *1 (finding bifurcation appropriate "[g]iven the derivative nature of [the Baltimore Police Department's] potential liability"). Bifurcation "in such situations streamline[s] the issues for trial [and], it prevents prejudice to the individual defendants that would otherwise arise from the introduction of evidence of prior incidents of police brutality in order to make a case against the municipality." *Taylor*, DKC-10-2167, 2010 WL 5247903, at *2.

To be sure, "*Monell* . . . and its progeny do not [always] require that a jury must first find an individual defendant liable before imposing liability on [a] local government." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985). There are some narrow circumstances in which "a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality." *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *see also, e.g.*, *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010). But, in such cases, municipal liability under *Monell* is limited to situations in which "such a finding would not create an *inconsistent* verdict" as to the individual defendants. *Thomas,* 604 F.3d at 305 (emphasis in *Thomas*).

For example, in *Thomas*, the Seventh Circuit determined that a municipality could be held liable under *Monell* for a prisoner's death even though none of the private prison health care

employees were found to have violated the decedent's constitutional rights. The *Thomas* Court noted that a critical fact supporting the jury's finding of *Monell* liability was that the individual defendants were physically unable to access prisoners' medical requests as a result of the county's policy. Thus, the Court concluded that liability on the part of the county was not inconsistent with the jury's finding in favor of the individual defendants. *Id.*

Moreover, "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights," even if the conduct of "no one employee may violate" those rights. *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985); *see Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."). But, these situations most often arise in cases where a plaintiff alleges understaffing by the municipality. No such allegation is made here.

In *Garcia*, 768 F.2d 303, plaintiffs brought suit against Salt Lake County and its officers, asserting claims under § 1983 following the death of a prisoner. *Id.* at 305-06. Plaintiffs asserted that the County was liable under *Monell* because that there was no physician present at the jail most of the time, including when the decedent had stopped breathing. *Id.* at 308. At trial, although the jury found none of the individual officers responsible under § 1983, the jury concluded that Salt Lake County was liable under *Monell*. *Id.* at 306. The County appealed, claiming that a municipality can only be liable under § 1983 if individual officers are found to have violated the decedent's civil rights. *Id.* The Tenth Circuit agreed with the plaintiffs, concluding that a finding

of liability against the County was not inconsistent with the finding that the individual officers were not liable. *Id.* at 308.

Similarly, in *Anderson*, 778 F.2d 678, plaintiffs brought suit, *inter alia*, against, the City of Atlanta and individual police officers who were working at the city's Pre-Trial Detention Center as a result of the death of a detainee. *Id.* at 680. The jury found none of the individual officers liable under § 1983, but determined that the city was liable because of understaffing. *Id.* at 686. The district court then granted defendants' motion for judgment notwithstanding the verdict, on the ground that the city could not be liable under *Monell* if the individual officers were found not to have violated the decedent's constitutional rights. *Id.* In reversing the trial court, the Eleventh Circuit stated: "[I]f the jury were to find, as it did, that the deprivation of [the decedent's] constitutional rights was a result of understaffing, then it would logically find no fault on the part of the individual arresting officers." *Id.* Nevertheless, the court reasoned, *id.*: "The jury could reasonably find that a policy of understaffing resulted in the unavailability of medical personnel and prevented individual officers from being able to do their tasks properly. . . . We see no inconsistency in the jury verdict holding the City liable and the individual officers not liable."

Courts have also determined that municipal liability under *Monell* is appropriate in the absence of liability for individual officers where "the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). And, courts have found municipal liability appropriate in the absence of a finding of individual officer liability under § 1983 where the individual officers are entitled to qualified immunity. *Int'l Ground Transp., Inc.*, 475 F.3d at 219; *accord Awalt v. Marketti*, No. 11 C 6142, 2012 WL 1161500, at *12 (N.D. Ill. Apr. 9, 2012). But here, the defense of qualified immunity has not been asserted by the Individual Medical Defendants.

Plaintiff alleges, ECF 1, ¶ 78:

> During Plaintiff's detention at JCI and for a period of time prior thereto, Wexford had notice of a widespread practice by its employees and agents at JCI under which involved [sic] inaccurately reporting symptoms of detainees with serious medical needs, particularly those with serious medical needs that required emergency medical treatment. It was common to observe detainees of JCI repeatedly requesting medical care and medication, but whose requests were routinely denied or complete [sic] ignored. On information and belief, a significant portion of these denials of medical care resulted in serious bodily injury.

Plaintiff also alleges that Wexford agents failed to communicate the medical needs of inmates among themselves, failed to accurately record symptoms, failed to respond to detainees who needed emergency treatment, and did not properly treat detainees. *Id.* ¶ 79. However, Haugie has not alleged that Wexford had policies of inadequate staffing at the relevant time. *See, e.g.*, *Thomas*, 604 F.3d at 305; *cf. Anderson*, 778 F.2d at 686; *Garcia*, 769 F.2d at 308. And, Haugie has not identified any acts outside of the conduct by the Individual Medical Defendants that allegedly violated his constitutional rights. *Cf. Thomas*, 604 F.3d at 305 (stating that the municipality could be liable under *Monell* without a finding of liability on the part of individual defendants if "the plaintiff here had only sued the County, or didn't know, because of some breakdown in recording shifts, who the [medical staff] on duty were").

In this case, then, it would appear that the *Monell* claim depends on a finding of liability on the part of the health care providers. Nevertheless, I express no ruling on whether, if a jury were to exonerate the Individual Medical Defendants, plaintiff would be entitled to proceed on his *Monell* claim. Regardless, bifurcation is appropriate.

**3.**

In my view, bifurcation is appropriate because it will promote judicial economy, conserve the parties' resources, and avoid prejudice to the Individual Medical Defendants, and will not prejudice the plaintiff.

As a practical matter, it would save time and resources, and promote judicial economy, to defer consideration of the *Monell* claim until after a determination of the liability of the Individual Medical Defendants. If Haughie fails to succeed on his claim of constitutionally inadequate medical care, this may obviate altogether the basis for a *Monell* claim. If he does not succeed on the individual claims, he might also choose to forgo the *Monell* claim. And, if he does succeed in the claims against the Individual Medical Defendants, Wexford might consider a resolution of the *Monell* claim, without the need for a trial. Any one of these scenarios would spare the Court and the parties of the burdens and challenges of litigating the *Monell* claim.

Moreover, the scope of discovery in a case with a *Monell* Claim is far broader than what is appropriate in an inadequate medical care claim. In a *Monell* case, a plaintiff generally seeks to rely on prior incidents involving other people. Haugie contends that he would elicit this kind of information through depositions of "supervisory managers or requests for production of the individual Defendants' personnel files." ECF 25 at 9. According to defendants, such discovery would involve combing through the records of 18,000 to 21,000 inmates. ECF 27 at 7. This is obviously unduly burdensome when the need for such information is unrelated to the threshold claim.

Notably, evidence of any prior failures of Wexford to provide adequate care to inmates in unrelated situations may be admissible against Wexford in regard to the *Monell* claim. But, such evidence is not likely to be admissible against the Individual Medical Defendants.

Such evidence is also potentially inflammatory in regard to the individual defendants, and it would be difficult for the jury to compartmentalize such evidence. *See Veal v. Kachiroubas*, No. 12 C 8342, 2014 WL 321708, at *6 (N.D. Ill. Jan. 29, 2014) ("Presenting evidence to the jury regarding a village-wide policy, practice or custom involving multiple improper police actions

poses a danger of undue prejudice to the defendant officers by creating the perception that the police department routinely acts improperly, even if the officers acted properly in this case."); *Taylor*, 2010 WL 5247903, at *2 ("[W]hile a jury instruction could limit the harm to [the defendant] from prejudicial evidence, no instruction is likely to remove entirely the potential for prejudice."); *Beasley*, 2010 WL 3221848, at *3 (finding that such evidence against a municipality "would be highly prejudicial to the individual government employees").  Bifurcation of the *Monell* Claim will allow the Court to separate issues and evidence as necessary to avoid prejudice.

In addition, bifurcation will facilitate an expeditious trial as to the Individual Medical Defendants (assuming the constitutional claim survives to trial), because it avoids the delay inherent in the extensive discovery that would be required to establish a *Monell* claim.  This would lead to a reduction of costs, without any real prejudice to plaintiff.  And, if the case goes to trial on the threshold claim, this avoids prolonging the trial.

As Judge Chasanow has said: "Streamlining the issues and limiting discovery . . . will curb rather than increase costs. . . ."  *Taylor*, 2010 WL 5247903, at *2; *see also Beasley*, 2010 WL 3221848, at *3 (stating that "bifurcation allows the court to isolate evidence regarding municipal policies and customs . . . ."); *Dawson*, 896 F. Supp. at 540 (discussing, in the context of a *Monell* Claim, coupled with allegations against individual officers, that "[t]he best way to avoid the conflicts resulting in trying the two claims together is to bifurcate them"); *Marryshow*, 139 F.R.D. at 320 (finding that "[b]ifurcation facilitates a trial in which the Court can allow in evidence only that portion, if any, of the Plaintiff's custom, practice or policy evidence that is relevant and admissible . . . .").

And, I am not persuaded by plaintiff's argument that bifurcation would infringe on his Seventh Amendment right to a jury trial.  The Seventh Amendment provides: "In suits at common

law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."

The Court of Appeals for the Fifth Circuit has explained: "The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues.[] Thus, [the] Constitution allows bifurcation of issues that are so separable that the second jury will not be called upon to reconsider findings of fact by the first." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996); a*ccord Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir.) ("The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact."), *cert. denied*, 516 U.S. 867 (1995).

Bifurcation of the *Monell* Claim against Wexford will not abridge plaintiff's Seventh Amendment rights. As defendants point out, the bifurcation plan under consideration would ensure that the first jury's decision is not reexamined by the second jury. ECF 27 at 5. In particular, the first jury would consider whether one or more of the Individual Medical Defendants violated Haugie's constitutional rights, while the second jury would be asked to determine whether Wexford's policies, procedures, and customs were the moving force behind the provision of allegedly inadequate medical care. *Id.* If some or all of the Individual Medical Defendants are found to have violated Haugie's constitutional rights, the second jury will be instructed accordingly and informed that it may not reconsider that issue. As Judge Quarles stated in *Newsome v. Up-to-Date Laundry, Inc.*, 219 F.R.D. 356, 364 (D. Md. 2004): "[I]n a bifurcated trial,

the Court would avoid conflicts with the reexamination clause of the Seventh Amendment by using a detailed verdict form to record the first phase jury's factual findings."

In sum, I am satisfied that the Court can avoid any risk of infringing on plaintiff's Seventh Amendment rights through the careful crafting of jury instructions and verdict forms. By exercising caution, as judges in this District have done many times under similar circumstances, the Court will ensure that any issues considered by the first jury are not reconsidered by the second jury.

### III.    Conclusion

For the aforementioned reasons, I shall grant the Motion to Amend (ECF 30); I shall deny Wexford's Motion (ECF 20) as premature; I shall deny the Motion to Dismiss (ECF 17), as moot; and I shall grant the Motion to Bifurcate (ECF 21).

An Order follows.


Date: March 9, 2020                                                    _____/s/_____

Ellen L. Hollander
United States District Judge