IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT HAUGHIE,

    *Plaintiff*,

    v.

WEXFORD HEALTH SOURCES, INC., *et al.*,

    *Defendants*.

Civil Action No. ELH-18-3963

**MEMORANDUM OPINION**

Plaintiff Robert Haughie, a Maryland prisoner, filed a civil rights suit, through counsel, under 42 U.S.C § 1983.  ECF 1 (the "Complaint"); ECF 40 ("Amended Complaint").  He also asserts claims under Maryland law.  Among other claims, plaintiff alleges constitutionally inadequate medical care with respect to the diagnosis of his brain tumor.

Plaintiff has sued a host of defendants, known and unknown, claiming they failed "to properly diagnose the tumor . . . ."  ECF 40, ¶ 6.  The defendants include Wexford Health Sources, Inc. ("Wexford"); Quinn Mallory, R.N.; Charles Williams III; Mary Rockefeller, N.P.; Michael Smith, R.N.; Marian Peters, R.N.; Nurse Newman Azubuike; Nurse Electa Awanga; Melaku Ayalew, M.D.; Yonas Sisay, M.D.; Hiruy Bishaw, M.D.; and P.A. Emmanuel (collectively, the "Medical Defendants").  Haughie also sued Doe Defendants 1-10, as well as the Maryland Department of Public Safety and Correctional Services ("DPSCS").[1]

---

[1] By Memorandum (ECF 35) and Order (ECF 36) of December 2, 2019, I dismissed the suit as to the DPSCS, based on Eleventh Amendment immunity.  Plaintiff's Amended Complaint does not add new allegations as to DPSCS.  Therefore, for the reasons stated in ECF 35, I shall again dismiss the suit as to DPSCS.

The operative pleading is the Amended Complaint (ECF 40).[2]  It contains seven causes of action, which I shall reference as counts.  Counts I through VI correspond to the claims in the original Complaint; only Count VII is new.  *See* ECF 1.  Plaintiff asserts that he "has been left over 50% disabled, and must live the rest of his life with severe difficulty walking, swallowing, and talking."  ECF 40, ¶ 6.  He seeks both compensatory and punitive damages as well as attorney's fees.  *Id.* at 23.

Count I alleges "Deprivation of Eighth Amendment Right to Medical Care," and is lodged against all defendants, pursuant to 42 U.S.C. § 1983. *Id.* ¶¶ 58-76.  Count II, lodged against Wexford and DPSCS, asserts "Policy & Practice of Denial of Medical Care," under 42 U.S.C. § 1983.  *Id.* ¶¶ 77-91.  In Count III, filed against all defendants, plaintiff asserts violations of Articles 24 and 25 of the Maryland Declaration of Rights.  *Id.* ¶¶ 92-96.  In Count IV, plaintiff asserts a claim against all defendants for intentional infliction of emotional distress.  *Id.* ¶¶ 97-103.  Count V is styled as "Respondeat Superior" and is lodged against Wexford.  *Id.* ¶¶ 104-106.  In Count VI, plaintiff seeks "Indemnification" as to Wexford and DPSCS.  *Id.* ¶¶ 107-110.  Count VII presents a claim for medical malpractice, lodged against Dr. Sisay, Nurse Smith, Nurse Rockefeller, Nurse Awanga, Dr. Ayalew, and P.A. Emmanuel.  *Id.* at 22.

Awanga, Ayalew, Azubuike, Bishaw, Mallory, Peters, Rockefeller, Sisay, Smith, and Wexford have moved to dismiss the Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 41.  The motion is supported by a memorandum of law.  ECF 41-1 (collectively, the "Motion").[3]  Haughie opposes the Motion.  ECF 42.  Defendants have replied.  ECF 43.

---

[2] Plaintiff has mislabeled ECF 40 as the "Complaint."

[3] Defendants note that Charles Williams III was not affiliated with Wexford.  ECF 41-1 at 2 n.1.  And, they point out that "P.A. Emmanuel" has not been "further identified."  *Id.*

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.  Factual and Procedural Background

Haughie is a Maryland prisoner incarcerated at "JCI."  ECF 40, ¶ 10. He alleges that on November 11, 2015, he "began to experience painful and debilitating headaches that refused to subside."  *Id.* ¶ 31.  These headaches affected his "balance, appetite, speech, alertness, vision, and continence and caused him to become dizzy." *Id.* ¶ 33.

Haughie's symptoms persisted until December 24, 2015, when he was hospitalized.  *Id.* ¶ 32.  At that time, he was diagnosed with a benign brain tumor.  *Id.* ¶ 34.  He underwent surgery a few days later, on December 28, 2015, at Johns Hopkins Hospital.  *Id.* ¶ 54.

Wexford is a corporation "hired by DPSCS to provide medical services to those who, like Plaintiff, are incarcerated in the Department of Corrections."  *Id.* ¶ 12.  It was responsible for plaintiff's medical care during the relevant time.  *Id.*  In November and December 2015, when Haughie's symptoms first appeared and persisted, he was seen by several Wexford health care providers.

On November 19, 2015, Haughie was seen by Williams, an attending nurse.  *Id.* ¶¶ 23, 35.  Although plaintiff allegedly reported his persistent headaches, he claims that Williams "failed to accurately report Plaintiff's symptoms on the medical records that would be viewed by other providers responsible for Plaintiff's care."  *Id.* ¶ 35.

---

Under Fed. R. Civ. P. 4(m), plaintiff was required to serve the defendants within 90 days of filing suit.  In ECF 38, a Memorandum Opinion of March 9, 2020, I incorrectly stated that Williams and Emmanuel had been served but did not respond.  *Id.* at 2.  Defendants noted the Court's error in their submission of April 1, 2020.  ECF 41-1 at 2 n.1.  Thus, plaintiff has been on notice since that date of the issue of service on these two defendants.

Accordingly, because plaintiff has never served these two defendants, I shall dismiss the suit as to them, without prejudice.  The Motion has not been filed on their behalf.

Haughie alleges that Sisay, an attending physician at JCI (*id.* ¶ 18), recorded Haughie's headaches and dizziness "as early as December 2, 2015, but no differential diagnosis was performed nor was any appropriate treatment provided." *Id.* ¶ 36. The next day, Dr. Sisay "continued" Haughie's existing prescriptions for Neurontin and Fioricet. *Id.* ¶ 37.

Smith, a nurse, saw Haughie on December 5, 2015. *Id.* ¶ 38. But, he "failed to record any of Plaintiff's complaints related to his debilitating headaches and dizziness or provide any treatment for Plaintiff's condition whatsoever." *Id.* And, Smith again saw Haughie on December 20, 2015, but again did not record his symptoms, according to plaintiff. *Id.* ¶ 40.

In the interim on December 14, 2015, Haughie was seen by Rockefeller, a nurse practitioner. *Id.* ¶¶ 26, 39. According to plaintiff, Rockefeller failed to record his symptoms. *Id.* ¶ 39.

Between December 20 and December 22, Haughie claims he could not eat or walk. *Id.* ¶ 41. Haughie went to health services on December 22, 2015, where he was again seen by Rockefeller. *Id.* ¶ 42. She "noted that Plaintiff appeared tired, semi-asleep, and was having difficulty talking." *Id.*

On the same date, Peters, a nurse, and Azubuike, also a nurse, "observed that Plaintiff appeared very drowsy, had slow quiet speech, and was unsteady walking." *Id.* ¶¶ 21, 24, 43. Further, they noted that plaintiff's blood pressure was elevated, he was unsteady in walking, and had reported vomiting, dizziness, and a headache. *Id.* ¶ 44.

According to Haughie, his condition was "drastically worse" than what was reported by defendants at the time. *Id.* ¶ 45. He alleges that at the time, he was "experiencing neurological damage from the growth of a brain tumor which caused extreme headaches, extreme disorientation, loss of motor function in his legs and hands, and extreme pain and suffering." *Id.*

During this time, a physician's assistant, identified as "P.A. Emmanuel," prescribed Motrin for Haughie. *Id.* ¶¶ 19, 46. However, no emergency treatment was provided, nor was a doctor called to evaluate plaintiff. *Id.* ¶ 47.

On December 23, 2015, defendant reported his symptoms to Dr. Ayalew and to nurse Awanga. *Id.* ¶¶ 16, 25, 49. Haughie alleges that both Ayalew and Awanga "falsely reported that Plaintiff was no longer experiencing headaches or disorientation, or lack of motor function, and decided Plaintiff did not need to be referred for any further treatment." *Id.* ¶ 49.

The following day, December 24, 2015, Haughie reported his "unabated" symptoms to Dr. Bishaw. *Id.* ¶¶ 17, 50. Haughie alleges that Dr. Bishaw "falsely reported that Plaintiff was no longer experiencing headaches, disorientation, or lack of motor function, and decided that Plaintiff did not need to be referred for any further treatment." *Id.* ¶ 50. Haughie maintains that his "pain and distress increased during this time" because he was not receiving appropriate treatment. *Id.* ¶ 51.

That day, a medical staff member noted that Haughie "was unable to move his left leg, had numbness in his left hand, no normal movement in [his] right hand, and had abdominal pain going through chest to shoulder." *Id.* At that point, Wexford staff called an ambulance and Haughie was transported to Baltimore Washington Medical Center. *Id.* ¶ 53. There, Haughie received a CT scan, which revealed a brain tumor. *Id.* Plaintiff was subsequently transferred to Johns Hopkins Hospital, *id.* ¶ 53, and underwent surgery there on December 28, 2015, to remove the brain tumor. *Id.* ¶ 54.

Plaintiff claims that his surgery was "complicated by increased intracranial pressure from the undiscovered and undiagnosed brain tumor." *Id.* ¶ 54. Moreover, he alleges that he

"currently suffers from a long term to permanent difficulty swallowing, walking, and talking. *Id.* ¶ 55.

Additional facts are included in the Discussion, *infra*.

## II.  Legal Standards

### A.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th

Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020);  *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286

(1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" under Rule 12(b)(6). *Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint,

or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

## B.  Section 1983

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tinsley*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).  But, to seek redress under § 1983, it is not enough merely to allege a violation of federal law; a violation of a federal right is required. *Carey v. Throwe*, 957 F.3d 468, 479 (4th Cir. 2020).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.  To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487

9

U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement—and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Of import here, § 1983 liability may extend to a private entity operating under color of state law, including private prison health care providers. *See, e.g.*, *West*, 487 U.S. at 49; *Polk*, 454 U.S. at 320; *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, Wexford and its staff may be subject to suit under § 1983. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability apply to a private corporation acting under color of state law).

Notably, § 1983 requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual

defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights).  In other words, there is no respondeat superior liability under § 1983.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Therefore, liability based on respondeat superior does not apply to a § 1983 action.  *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, ___ F.3d ___, 2020 WL 5014880 at *9 (4th Cir. Aug. 20, 2020).  With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1)  That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

In *Monell v. New York City Dep't of Soc. Serv.'s*., 436 U.S. 658, 691 (1978), the Supreme Court determined that governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an

official policy, custom, or practice of the local government that resulted in a violation of the plaintiff's federal rights. *Id.* at 690-91. Therefore, a plaintiff seeking to establish such liability pursuant to § 1983 must "adequately plead and prove the existence of an official policy or custom that is fairly attributable" to the governmental body and that it "proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). "An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 480 (1986)).

### III. Discussion

#### A. Count One: The Eighth Amendment Claims

##### 1. The Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Florian*, *supra*, 2020 WL 5014880, at *5; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). It protects the rights of convicted prisoners, as opposed to pretrial detainees. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F. 3d 539, 543 (4th Cir. 2017). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

The so called deliberate indifference standard applies to cases alleging failure to protect inmates from attack, inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303; *Florian*, 2020 WL 5014880, at *5; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). And, "[i]t is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (stating that an official acts with deliberate indifference "if he had actual knowledge of the prisoner's serious medical needs and the related risks, but nevertheless disregarded them"); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017).

Thus, the claimed deprivations must satisfy objective and subjective requirements. *Florian*, 2020 WL 5014880, at *5; *Kingsley*, 877 F.3d at 543.   To satisfy the objective

component, the alleged deprivation "must be sufficiently serious." *Florian*, 2020 WL 5014880, at *5 (cleaned up); *see Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019).   As the Fourth Circuit recently explained, to be sufficiently serious, the deprivation must be "extreme." *Florian*, 2020 WL 5014480 at *5.   This requires "'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm.'" *Scinto*, 841 F.3d at 225 (citation omitted).

With respect to the subjective prong, the plaintiff must show that the defendant possessed a "'sufficiently culpable state of mind.'" *Florian*, 2020 WL 5014880 at *6 (citation omitted). Notably, the prohibited conduct is characterized by "obduracy and wantonness, not inadvertence or error in good faith . . . ." *Wilson*, 501 U.S. at 299 (emphasis omitted).

Of relevance here, the Fourth Circuit recently made plain that deliberate indifference "is a form of *mens rea* (or 'guilty mind') equivalent to criminal-law recklessness." *Florian*, 2020 WL 5014480 at *6 (citing *Farmer*, 511 U.S. at 839-40).   Two showings are required:   "'[T]he prison official must have both subjectively recognized a risk of substantial harm and subjectively recognized that his actions were inappropriate in light of that risk.'" *Florian*, 2020 WL 5014480 at *6 (citation and some quotation marks omitted).

To state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that a defendant's actions or the failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).   The Fourth Circuit has characterized the applicable standard as an "exacting" one.  *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

14

staff was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *King*, 825 F.3d at 219; *see also Gordon*, 937 F.3d at 357; *DePaola*, 884 F.3d at 486. Of relevance here, "[t]he necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying or delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

As the Court said in *Heyer*, 849 F.3d at 209-10: "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. In a case involving a claim of deliberate indifference to a serious medical need, the inmate must also show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."

Put another way, "[t]o show an Eighth Amendment violation, it is not enough that the defendant *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*). The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000), is also pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate inference claim requires more than a showing of "mere negligence");

16

*Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."); *Gardner v. United States*, 184 F. Supp. 3d 175, 180 (D. Md. 2016) (recognizing that negligence does not amount to deliberate indifference).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *see Gordon*, 937 F.3d at 357; *Scinto*, 841 F.3d at 225. Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). But, without evidence that a healthcare provider linked the presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met. *Johnson*, 145 F.3d at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge).

Moreover, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560,

561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011). And, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

## 2.  Claim of Deliberate Indifference

Defendants argue that the Amended Complaint fails to set forth facts to show that any of the Medical Defendants were deliberately indifferent to Haughie's medical needs. ECF 41-1 at 7.

To be sure, plaintiff has alleged a serious medical condition. He has alleged that, objectively, he was in need of medical treatment for a brain tumor. *See Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (noting that the objective component involves whether the alleged harm to the plaintiff is sufficiently serious, rather than whether "the symptoms displayed to the prison employee are sufficiently serious"). He also claims: "As a result of the Medical Defendants' failure to accurately diagnose Plaintiff's brain tumor, Plaintiff currently suffers from a long term to permanent difficulty swallowing, walking, and talking." ECF 40, ¶ 55.

The second prong of the inquiry concerns the issue of whether defendants acted with deliberate indifference to a serious medical need. The Amended Complaint alleges: "Each of the Defendants to this claim were made aware of Mr. Haughie's brain tumor by observing the symptoms themselves, and by being informed of it by Plaintiff, other detainees in the facility and infirmary, JCI correctional officers, and other employees and personnel of Wexford." ECF 40, ¶

63.   According to plaintiff, the defendants all observed some combination of headaches, dizziness, loss of motor function, and speech issues.  Moreover, Haughie contends that each defendant was aware that the headaches he reported affected his "balance, appetite, speech, alertness, vision, and continence and caused him to become dizzy." *Id.* ¶ 33.

Plaintiff alleges that his symptoms first appeared on November 11, 2015.  Hindsight is always 20-20; the symptoms plaintiff described on that date were generic complaints that could have been caused by any number of relatively benign conditions.  And, by December 24, 2015, when the symptoms persisted and worsened, plaintiff was taken to the hospital.

Moreover, the allegations do not indicate that plaintiff reported all symptoms to all defendants, or that each defendant was aware of every symptom.  Plaintiff alleges that his symptoms were not accurately recorded.  Thus, he acknowledges, at least implicitly, that a health care provider would not have known of all his complaints from a review of the medical records. Moreover, although plaintiff claims that his symptoms were incorrectly recorded, *id.* ¶ 49, he does not allege that the error was deliberate.  *Id.*[4]  Clearly, his symptoms worsened over a period of a few weeks, culminating in "pain, dizziness, loss of appetite, difficulty with speech, and decreased alertness," among other symptoms.  *Id.* ¶ 34.

For example, the Amended Complaint alleges that Haughie reported only his "painful and debilitating headaches" to Mallory on November 11, 2015, and that Mallory failed to record his complaints.  *Id.* ¶ 31.  It does not follow that Mallory knew plaintiff was suffering from a medical condition that required further treatment simply because plaintiff reported that he was suffering from headaches.  The factual allegations as to Mallory do not rise to the level of deliberate indifference.

---

[4] As defendants point out, as a licensed medical doctor, Dr. Ayalew had "nothing to gain" by intentionally falsifying medical records.  ECF 41-1 at 10.

The Amended Complaint also alleges that Haughie was seen by Dr. Sisay on December 2, 2015. *Id.* ¶ 36. Plaintiff claims that, despite his report of headaches and dizziness, Dr. Sisay merely "continue[d] Plaintiff's prescription for Neurontin and Fioricet." *Id.* ¶ 37. But, the Amended Complaint alleges only that Haughie presented complaints of headache and dizziness. Those symptoms are associated with many benign conditions. Dr. Sisay's alleged failure to provide a "differential diagnosis" (*id.*) does not amount to deliberate indifference

Smith allegedly observed plaintiff twice — on December 5, 2015 and December 20, 2015. *Id.* ¶¶ 38, 40. On both occasions, plaintiff alleges that Smith failed to record plaintiff's complaints of headaches and dizziness. *Id.* This not give rise to deliberate indifference.

Further, plaintiff alleges that he saw Rockefeller for the first time on December 14, 2015, and again on December 22, 2015. *Id.* ¶¶ 39, 42. On December 14, 2015, Rockefeller allegedly "failed to record any of Plaintiff's complaints related to his debilitating headaches and dizziness or provide any treatment for Plaintiff's condition whatsoever." *Id.* ¶ 39. But, Rockefeller would have had no reason to suspect a brain tumor, given that Dr. Sisay had renewed plaintiff's medication 12 days earlier.

However, by December 22, 2015, plaintiff's condition was "drastically worse." *Id.* ¶ 45. He alleges that by this time, he was experiencing "extreme headaches, extreme disorientation, loss of motor function in his legs and hands, and extreme pain and suffering." *Id.*

On that date, plaintiff reported to Rockefeller that "he had not eaten in two days, was dizzy, could not walk far, and had persistent headache[s] since November 11, 2015." *Id.* ¶ 42. Rockefeller "noted that Plaintiff appeared tired, semi-asleep, and was having difficulty walking." *Id.* The same day, Peters and Azubuike "observed that Plaintiff appeared very drowsy, had slow quiet speech, and was unsteady walking." *Id.* ¶ 43. They also observed that he had elevated

blood pressure.  *Id.* ¶ 44.  They recorded that Haughie reported to them that he had vomited twice and was dizzy. *Id.*

Defendants maintain that Haughie's symptoms were "consistent with the pre-existing migraine condition for which Haughie was already receiving treatment . . . ."  ECF 41-1 at 9. And, they argue that Peters and Azubuike, as registered nurses, "could not make a medical diagnosis or prescribe medicine.  All a registered nurse could do is refer Haughie to a higher-level provider."  *Id.*  These facts are not appropriate for consideration at this juncture, however. Nevertheless, by plaintiff's own allegations, the health care providers did not ignore Haughie; they attempted to address Haughie's symptoms.  P.A. Emmanuel allegedly administered Motrin to Haughie.  ECF 40, ¶ 46.  And, he was prescribed clonidine.  *Id.* ¶ 48.

In the light most favorable to plaintiff, and considering only the facts he alleged, the symptoms described by plaintiff as of December 22, 2015, would have alerted a health care provider to the need for a doctor to evaluate plaintiff.  Yet, plaintiff claims that he was seen by Dr. Ayalew the next day, on December 23, 2015.  ECF 40, ¶ 49.  And, by December 24, 2015, plaintiff was transported to the hospital after an unnamed health care provider "recorded that Plaintiff was unable to move his left leg, had numbness in his left hand, no normal movement in right hand, and had abdominal pain going through chest to shoulder."  *Id.* ¶ 52.

Thus, there was a delay of about two days — from December 22, 2015 to December 24, 2015 — before plaintiff was taken to the hospital.  And, measuring from November 11, 2015, when plaintiff first reported headaches, there was a delay of about six weeks.

To be sure, "'[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.'" *Abraham v. McDonald*, 493 F. App'x 465, 466 (4th Cir. 2012) (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir.

2010) (discussing a delay in treatment of three months)); *see Smith v. Smith*, 589 F.3d 736. 738-49 (4th Cir. 2009) (active interference in care causing a delay of several weeks).  But, the facts as alleged do not support a claim of deliberate indifference.  During the relevant time, plaintiff was seen by medical providers on several occasions.  Medicine was prescribed.  The symptoms apparently were not severe until December 22, 2015.  A doctor evaluated plaintiff the next day, December 23, 2015.  And, by December 24, 2015, plaintiff was taken to the hospital.  This is not conduct that smacks of deliberate indifference.  Moreover, plaintiff has not alleged that the long-term injuries he suffers now could have been avoided if defendants had acted on November 11, 2015 or December 22, 2015, instead of December 24, 2015.[5]

Plaintiff has stated a classic claim of medical negligence, not deliberate indifference.  Any failure to have diagnosed plaintiff more promptly does not amount to a constitutional violation.  *See Gardner*, 184 F. Supp. 3d at 180; *see, e.g.*, *Loya v. Wexford*, GJH-19-1646, 2020 WL 1158575 (D. Md. Mar. 9, 2020).

### 3.  Civil Conspiracy Claim

Defendants contend that, to the extent that Haughie attempts to state a § 1983 claim for civil conspiracy, he has failed to do so.  ECF 41-1 at 11.  They argue that he "fails to allege any facts and his complaint does not show a plausible entitlement to relief. . . ."  *Id.*  According to defendants, plaintiff merely recited the legal elements of liability.  *Id.* n.5.

Plaintiff maintains that he has alleged that "every single defendant is a licensed medical professional" who was aware of the medical standard of care.  ECF 42 at 15.  He asserts that he

---

[5] Many individuals who are not incarcerated might have experienced comparable delays, either in getting a medical appointment in the first place and/or in scheduling diagnostic testing. Health care providers usually do not resort to sophisticated testing at the first sign of symptoms when those symptoms could be indicative of a number of benign conditions.  When a doctor hears hoofbeats, he or she first thinks horses, not zebras.

has alleged that the defendants "worked together to deny Plaintiff's medical care by improperly treating, properly document [sic], and make referrals until Plaintiff's health deteriorated to the point that he was unable to move part of his body, was in pain, and had difficulty speaking." *Id.* at 15-16. And, he states that he has alleged that "the Defendants did so to protect one another from liability of depriving Plaintiff of his rights." *Id.* at 16. These three allegations, according to Haughie, satisfy the elements of a claim for civil conspiracy.

To plead a claim of conspiracy under § 1983, the plaintiff must allege that the defendants "'acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right.'" *Barrett v. PAE Government Services, Inc.*, ___ F.3d ___, 2020 WL 5523552, at *13 (4th Cir. Sept. 15, 2020) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)).  Notably, the "'factual allegations must plausibly suggest *agreement*, rather than being merely *consistent* with agreement.'"  *Barrett*, 2020 WL 5523552, at *14 (citation omitted) (emphasis added in *Barrett*).

Similarly, in Maryland, a claim of civil conspiracy contains three elements: "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of lawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damages resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007) (quoting *Van Royen v. Lacey*, 262 Md. 94, 97-98, 277 A.2d 13, 14-15 (1971) ); *see also Bellezza v. Greater Havre De Grace Yacht Club, Inc.*, No. 0367 Sept. Term 2014, 2015 WL 6394418, at *9 (Md. Ct. Spec. App. Oct. 22, 2015), *cert. denied*, 446 Md. 291, 132 A.3d 194 (2016). But, "civil conspiracy is not a 'separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Bellezza*, 2015 WL 6394418, at *9 (quoting *Alleco, Inc. v.*

*Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1045 (1995)); *see also Alexander v. Evander*, 336 Md. 635, 645 n.8, 650 A.2d 260, 265 n.8 (1994).

Accordingly, plaintiff must allege that he was injured by an overt tortious act done in pursuance of a conspiracy. *Alleco, Inc.*, 340 Md. at 190, 665 A.2d at 1045. In other words, "'it is not ... for simply conspiring to do the unlawful act that the action [of conspiracy] lies. It is for doing the act itself, and the resulting actual damage to the plaintiff, that afford the ground of the action.'" *Id.* (quoting *Kimball v. Harman and Burch*, 34 Md. 407, 409 (1871)).

Haughie's Amended Complaint fails plausibly to allege facts that, if found, would establish an agreement or understanding among the Medical Defendants.  The following two paragraphs in the Amended Complaint contain mere conclusory assertions, ECF 40, ¶¶ 70, 71:

> 70. In addition, Defendants reached an agreement among themselves and others known and unknown to deprive Plaintiff of his constitutional rights by denying him medical care for an objectively serious medical need and to protect one another from liability for depriving Plaintiff of his rights.

> 71. In furtherance of this conspiracy, each of the co-conspirators committed overt acts with full subjective knowledge of the consequences to Plaintiff's medical health and was otherwise a willful participant in joint activity.

These assertions cannot sustain a claim for civil conspiracy on the part of the Medical Defendants.  Indeed, what the *Barrett* Court said regarding a § 1983 claim, albeit in a different context, is apt here:  "Plaintiff . . . sets forth no factual allegations that might explain why the [defendants] would enter into such an agreement . . . to intentionally violate Plaintiff's constitutional rights."  *Barrett*, 2020 WL 5523552, at *14.  The Court added, *id.*:  "Even if an allegation of a specific motive might not be required to state a claim for conspiracy, the Plaintiff was still required to allege *some* facts that would plausibly suggest that the [defendants] entered into an agreement . . . to accomplish the same conspiratorial objective."  (Emphasis in *Barrett*).

#### 4. Supervisory Liability

Defendants argue that Haughie has failed to state a claim for supervisory liability against Wexford under Count I.  As noted, Section 1983 requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no *respondeat superior* liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Florian*, 2020 WL 5014880, at *9.  With respect to a supervisory liability claim in a § 1983 action, plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to ... the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

Plaintiff contends that he has sufficiently pleaded actual or constructive knowledge because the violations he has alleged are widespread, and Wexford should have known about them. He points to other cases involving Wexford. ECF 42 at 12-13. And, he claims that Wexford had actual knowledge of his symptoms because he alerted the medical staff. *Id.* at 13. In plaintiff's view, he has alleged the deliberate indifference of Wexford, because the medical staff failed to respond to his complaints. *Id.* at 14. And, he argues that there is an affirmative causal link between Wexford's staff's "refusal to treat, properly document, and refer patients with brain tumors" and his "debilitating injury." *Id.* at 14.

Defendants counter that the Amended Complaint "does not allege that any Defendant supervised any other person" and plaintiff cannot rely on unidentified supervisors. ECF 43 at 6. Because respondeat superior liability does not exist in a § 1983 claim, defendants argue that "Wexford cannot be held liable simply because it employed a supervisor." *Id.* at 7.

I agree with defendants. The Amended Complaint is bereft of allegations concerning the presence of supervisors or any reports to supervisors. In fact, Haughie's theory of liability for some defendants, such as Peters and Azubuike, depends on their *failure* to report his symptoms to a supervisor. Accordingly, I conclude that Haughie has failed to state a claim for supervisory liability against Wexford in Count I.

### B. Count II: Policy and Practice of Denial of Medical Care

In Count II, plaintiff alleges that there are several widespread policies and practices at JCI that amount to a denial of medical care. He asserts, ECF 40, ¶ 79:

> Specifically, a widespread practice existed at JCI under which employees and agents of Wexford and DPSCS commonly failed or refused to: (1) communicate the medical needs of inmates among correctional officers and medical staff; (2); accurately report the actual symptoms and conditions communicated to them by inmates on medical records; (3) respond to detainees who requested treatment for

serious medical needs that required emergency treatment; and (4) properly treat detainees exhibiting symptoms of serious medical conditions.

Defendants argue that Haughie merely asserts "conclusory jargon." ECF 41-1 at 13. They posit that although Haughie "uses the vocabulary courts use when discussing the elements of a *Monell* claim, he never alleges any facts to show the existence of any identifiable policy or custom. Haughie never alleges any fact about how any patient was treated other than himself." *Id.*

Haughie counters that he has identified three policies or customs that resulted in a constitutional injury. ECF 42 at 11. They are: "One, a refusal to treat a patient's brain tumor until [the] patient is no longer able to recover from the injury. . ..Two, a refusal to accurately describe and document a patient's symptoms of a brain tumor intending to delay potential treatment for a brain tumor. . . Three, a refusal to take patients with symptoms of brain tumors to a medical specialist to identify, treat, and remove the tumor, to ensure the patient does not suffer long term disability, severe pain, or life threatening injury." ECF 42 at 11.

In the seminal case of *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Id.* at 690-91; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 384 (1989) (emphasis in original).

As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury the government as an entity is responsible under § 1983."   Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001).

As indicated, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers.  *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL 4581327, at *7 (D. Md. Sept. 1, 2016).   Standards applicable to municipalities are also applicable to private corporations acting under color of state law.  *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

Haughie's Amendment Complaint contains allegations only as to Haughie.  There are no other allegations in the Amended Complaint from which this Court could conclude that he has adequately pleaded a custom or policy of refusing to treat people with brain tumors, refusing accurately to document patient symptoms, or refusing to take patients to health care specialists. Accordingly, I shall dismiss Count II as to Wexford.

### C.  Count III: Maryland Declaration of Rights

Count III asserts that all defendants are liable for violations of Articles 24 and 25 of the Maryland Declaration of Rights.  ECF 40, ¶¶ 92-96.  Defendants contend that, as employees of a private entity, they cannot commit violations of the Maryland Declaration of Rights.  ECF 41-1 at 13.  Even if the Maryland Declaration of Rights governed their conduct, defendants contend that Article 24 is a due process provision, and therefore does not apply because Haughie is a prisoner, and not a pre-trial detainee.  *Id.* at 14.  And, defendants argue that Article 25 does not apply because it is only meant to constrain "Courts of Law."  *Id.* at 15.

Plaintiff argues that claims against private entities under the Maryland Declaration of Rights have been upheld when the entity is an "agent of the government."  ECF 42 at 16 (citing *Bost v. Wexford Health Sources, Inc.*, 2018 WL 3539819, at *42 (D. Md. July 23, 2018)).  And, he contends that because he has stated a claim for an Eighth Amendment violation, he has stated a claim under Article 25.  ECF 42 at 17.

As noted, plaintiff has alleged a claim against all defendants pursuant to Article 24 of the Maryland Declaration of Rights. ECF 40, ¶¶ 92-96. Article 24 of provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Article 24 is the State's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003). Moreover, it "is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F.Supp.2d 474 (D. Md. 2013) (quotation marks omitted). And, Article 24 is ordinarily interpreted *in pari materia* with its federal analog. *See, e.g.*, *Littleton v. Swonger*, 502 F. App'x. 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed in pari

materia with the ... Fourteenth Amendment[ ]"); *Dent v. Montgomery Cty. Police Dept.*, 745 F.Supp.2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the ... Fourteenth Amendment[ ]"); *Tyler v. City of College Park*, 415 Md. 475, 499-500, 3 A.3d 421, 435 (2010) (recognizing that Maryland courts "interpret Article 24 *in pari materia* with the Fourteenth Amendment to the United States Constitution."); *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (same).

In other words, Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v. Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins*, 955 F.Supp.2d 474.

The Fourteenth Amendment protects the rights of pretrial detainees. Haughie was not a pretrial detainee. *See* ECF 1, ¶ 10. Haughie was in postconviction status and his federal claims are thus rooted in the Eighth Amendment.  As a result, Article 24 does not apply.  Plaintiff's reliance *on Bost* is unavailing: *in Bost*, I stated that I "need not determine" whether at the time of the alleged constitutional violation the decedent "was a pretrial detainee or a postconviction detainee."  *Bost*, 2018 WL 3539819, at *42.  Here, plaintiff does not dispute he was a postconviction detainee.

Plaintiff has also lodged a claim against defendants under Article 25.  The Maryland Court of Appeals has consistently construed Article 25 of the Maryland Declaration of Rights as being *in pari materia* with the Eighth Amendment to the Constitution. *See Holly v. State,* 241

Md. App. 349, 369, 211 A.3d 496, 509 (2009); *see also Taylor v. Somerset County Commissioners*, RDB-16-00336, 2016 WL 3906641, at *6 n.5 (D. Md. July 19, 2016); *Evans v. State*, 396 Md. 256, 327, 914 A.2d 25, 67 (2006). Article 25 provides: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."

However, Haughie has not stated a claim of deliberate indifference under the Eighth Amendment.  It follows that he also fails to state a claim under Article 25.

### D.  Count IV: Intentional Infliction of Emotional Distress

Defendants argue that Haughie has not stated a claim under Maryland law for intentional infliction of emotional distress ("IIED").  They argue that he has failed to allege extreme and outrageous conduct on the part of the Medical Defendants, and that he has failed to allege that "he suffered a severely disabling emotional response to such conduct."  ECF 41-1 at 15. Haughie counters that the Medical Defendants did nothing as they observed his condition worsen, and this constitutes extreme and outrageous conduct.  ECF 42 at 17.

Generally speaking, claims for IIED are disfavored, difficult to establish and, as such, "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F.Supp.2d 751, 757 (D. Md. 2011); *see generally Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015); *Manikhi v. Mass. Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95, 113 (2000); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of intentional infliction of emotional distress is "difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *see also* DAVID CRUMP RETHINKING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, 25 Geo. Mason L. Rev. 287, 297 (2018) (noting that an IIED claim is "a

kind of vituperative epithet" that "adds little that can be the subject of a separate or additional recovery" but "makes [the litigation] more expensive").

In order to prevail on a claim for IIED in Maryland, a plaintiff must show that (1) the defendants' conduct was intentional or reckless; (2) their conduct was extreme and outrageous; (3) there was a causal connection between the defendants' wrongful conduct and the emotional distress suffered; and (4) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); *accord, e.g.*, *Caldor, Inc. v. Bowden*, 330 Md. 632, 641-42, 625 A.2d 959, 963 (1993); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010); *see also Veney v. Prince George's Cty.*, No. 1313, Sept. Term 2016, 2018 WL 1778644, at *6 (Md. Ct. Spec. App. Apr. 13, 2018).

The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham*, 85 F.Supp.3d at 850 (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F.Supp.2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986) ), *aff'd*, 166 F.3d 1208 (4th Cir. 1998). Moreover, since the Maryland Court of Appeals first recognized the tort of IIED in 1977, *Harris*, 281 Md. 560, 380 A.2d 611, it has repeatedly advised that "recovery" for IIED "will be meted out sparingly[.]" *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991); *see Batson v. Shiflett*, 325 Md. 684, 733, 602 A.2d 1191, 1216 (1992); *Caldor, Inc.*, 330 Md. at 642, 625 A.2d at 963.

A showing of "severe" emotional distress requires a plaintiff to "plead specific facts regarding the nature, intensity, and duration of the alleged emotional trauma." *Chin v. Wilhelm*, Civil No. CCB-02-01551, 2006 WL 827343, at *9 (D. Md. Mar. 24, 2006) (citing *Manikhi*, 360 Md. at 367, 758 A.2d at 113). To survive a motion to dismiss, the facts alleged must give rise to the inference that the plaintiff experienced "severely disabling emotional trauma," *Chin*, 2006 WL 827343, at *9, *i.e.* that he was rendered "'unable to function'" or "'unable to attend to necessary matters.'" *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 161, 502 A.2d 1101, 1115 (1986) (quoting *Hamilton*, 66 Md. App. at 59, 502 A.2d at 1064).

This standard is very difficult to meet. In *Takacs v. Fiore*, 473 F.Supp.2d 647, 652 (D. Md. 2007), for example, the court dismissed plaintiff's IIED claim for failure sufficiently to allege severe distress, even though plaintiff had alleged "severe depression, anxiety, sleeplessness, headaches and [being] sick to her stomach." The court determined that the severity "threshold is reached when a plaintiff's 'emotional distress is so severe as to have disrupted her ability to function on a daily basis.'" *Id.* (quoting *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F.Supp. 720, 750 (D. Md. 1996)). Because the plaintiff in Takacs did not "allege that she has been unable to function on a daily basis," the court dismissed her claim. 473 F.Supp.2d at 652.

Likewise, in *Manikhi*, 360 Md. at 370, 758 A.2d at 115, the Maryland Court of Appeals affirmed dismissal of an IIED claim where the plaintiff alleged she was forced to seek medical treatment as a result of her emotional distress, but she did not state, "for example," "whether the medical treatment that she was forced to seek was of a psychological or physical nature, how long the treatment lasted, whether it was successful or is still continuing, whether it was periodic or intensive, and so forth." Without such information, the court agreed that the plaintiff had

failed to "state with reasonable certainty the nature, intensity or duration of the alleged emotional injury." *Id.*

The conduct alleged on the part of the Medical Defendants does not rise to the level of extreme or outrageous conduct, within the meaning of the cases referenced earlier.  In any event, Haughie has not alleged severe emotional distressed sufficient to sustain a claim for intentional infliction of emotional distress.  His Amended Complaint contains a single allegation relevant to his mental state: "As a result of Defendants' conduct, Plaintiff suffered extreme and severe emotional distress while he feared for his life for the month during which he was denied medical care." ECF 40, ¶ 103.  This is not enough to meet the high standard under Maryland law, which requires that a pleading contain more specific allegations concerning the psychological harm suffered by the plaintiff.

### E.  Count V: *Respondeat Superior*

In Count V, plaintiff states, ECF 40, ¶¶ 105, 106:

105. In committing the acts alleged in the preceding paragraphs, the individual Custody Defendants were employees and agents of DPSCS, and the individual Medical Defendants were employees and agents of Wexford, each of whom acted at all times within the scope of their employment.

106. Both Wexford and the DPSC are liable as principal for the torts of its agents, and both are therefore liable under a theory of respondeat superior for all claims other than those stated under 42 U.S.C. § 1983.

Defendants argue that this count is "merely redundant of Counts 3 and 4, in which Wexford is named as a defendant, and Haughie seeks to recover under State law for the conduct of Wexford's employees.  ECF 41-1 at 18.  Further, they note that "*respondeat superior* is not an independent cause of action."  *Id.*

Haughie does not challenge this argument.  *See Stenlund v. Marriot Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff

concedes the point."); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (same).  Accordingly, I shall dismiss Count V.

### F.   Count VI: Indemnification

Count VI states, ECF 40, ¶¶ 108-110:

108.  Maryland law provides that public entities are directed to pay any tort judgment for which employees are liable within the scope of their employment.

109.  Defendants are or were employees of Wexford, JCI, and/or DPSCS, who acted in the scope of their employment in committing the misconduct described herein.

110.  Wexford is liable as principal for all torts committed by its agents.

Defendants argue that Haughie "has no conceivable right to be indemnified by Wexford and he has no authority or standing to pursue a right to indemnification that any other person might hold against Wexford."  ECF 41-1 at 18.  They note that Haughie does not have a contract with Wexford.  *Id.*

Haughie has not responded to this argument.  Therefore, he has waived it.  *See Stenlund*, 172 F. Supp. 3d at 887; *Ferdinand-Davenport*, 742 F. Supp. 2d at 777.

Accordingly,  I shall dismiss Count VI, although I shall do so without prejudice.

### G.   Count VII: Medical Malpractice

Haughie brings a claim of medical malpractice against Sisay, Smith, Rockefeller Awanga, Ayalew, and Emmanuel, under Md. Code (2013 Repl. Vol., 2019 Supp.), § 3-2A-01 *et seq.* of the Courts and Judicial proceedings Article ("C.J.").  ECF 40, ¶¶ 112-19.  He contends that the "current standard of medical care requires that treatment of individuals reporting symptoms of a brain tumor" should be referred "to a specialist for analysis."  *Id.* ¶ 114.  He alleges that each of the defendants breached this standard of care.  *Id.*

According to plaintiff, anyone displaying symptoms of vertigo should receive a comprehensive examination and receive a follow up within one to two weeks. *Id.* ¶ 115. And, he alleges that "the current standard of medical care requires that where any signs of a life-threatening central cause of vertigo (i.e. concurrent chronic or worsening headache, visual changes, nausea and/or vomiting) prompt an urgent workup in the Emergency Room or consultation with an Otolaryngology specialist." *Id.* ¶ 116 [sic]. He also complains that he was denied access to a specialist for over a month. *Id.* ¶ 117. As a result, his tumor went undiagnosed and he suffered additional complications. *Id.* ¶ 118.

The Maryland Court of Appeals has said, *Dingle v. Belin*, 358 Md. 354, 368, 749 A.2d 157, 164 (2000): "The traditional [medical malpractice] action has been for negligence in the performance (or non-performance) of a course of therapy or a medical procedure." In Maryland, a "prima facie case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of." *Weimer v. Hetrick*, 309 Md. 536, 553, 525 A.2d 643, 651 (1987) (citation omitted); *see Dehn v. Edgecombe*, 384 Md. 606, 610, 865 A.2d 603, 618 (2005) ("Medical malpractice 'is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability.'") (quoting *Benson v. Mays*, 245 Md. 632, 636, 227 A.2d 220, 223 (1967)); *see also Puppolo v. Adventist Healthcare, Inc.*, 215 Md. App. 517, 534, 81 A.3d 620, 629 (2013); *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 330, 37 A.3d 1074, 1078 (2012) ("The elements of the tort [of medical malpractice] are duty (standard of care); breach of the standard of care; causation of injury; and damages.").

36

This standard applies in federal court. *Ford v. United States*, 165 F. Supp. 3d 400, 422-23 (D. Md. 2016) (stating that the elements of a medical malpractice claim include: "(1) the applicable standard of care; (2) that this standard has been breached; and (3) a causal relationship between the violation and the injury"); *see Lawson v. United States*, 454 F. Supp. 2d 373, 416 (D. Md. 2006) (same).

Of course, the standard of care varies with the type of provider. *See* C.J. § 3-2A-02(c)(1). In regard to a physician, recovery for medical malpractice is allowed only "where there is a relationship between the doctor and patient." *Dehn*, 384 Md. at 620, 865 A.2d at 611; *see Eid v. Duke*, 373 Md. 2, 16, 816 A.2d 844, 852 (2003); *Dingle*, 358 Md. at 367, 749 A.2d at 164; *Hoover v. Williamson*, 236 Md. 250, 253, 203 A.2d 861, 863 (1964). Such a relationship "may be established by contract, express or implied, although creation of the relationship does not require the formalities of a contract, and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *Dehn*, 384 Md. at 620, 865 A.2d at 611. Fundamentally, the relationship must be "a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established." *Id.*

As to the standard of care, a health care provider must "'use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs, acting in the same or similar circumstances.'" *Dingle*, 358 Md. at 368, 749 A.2d at 164 (quoting *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 200, 349 A.2d 245, 252 (1975)) (alteration in *Dingle*) (internal footnote omitted); *see Upper Chesapeake Health Ctr., Inc. v. Gargiulo*, 223 Md. App. 772, 2015 WL 6112393, at *5 (June 22, 2015, Md. Ct. Spec. App.), *cert. denied*, 445 Md. 22, 123 A.3d 1007 (2015); *see also Ford*, 165 F. Supp. 3d at

423.  Put differently, the "care given or withheld" must be "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action." *Dingle*, 358 Md. at 368, 749 A.2d at 164 (citation omitted).

Moreover, "'advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account.'" *Ford*, 165 F. Supp. 3d at 423 (quoting *Shilkret*, 276 Md. at 200-01, 349 A.2d at 253). And, a claim for medical malpractice "necessarily focuses on the manner in which the physician diagnosed and treated the patient's medical problem and . . . not so much on what was told to the patient or what the patient's expectations may have been." *Dingle*, 358 Md. at 368, 749 A.2d at 164; *see also Gargiulo*, 223 Md. App. 772, 2015 WL 6112393, at *5.

Defendants contend that Haughie's claim is partially barred by the statute of limitations. The statute of limitations applicable to medical negligence claims is found in C.J. § 5-109, titled "Actions against health care providers." It states, in relevant part:

(a) *Limitations*. —  An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3-2A-01 of this article, shall be filed within the earlier of:

(1) Five years of the time the injury was committed; or
(2) Three years of the date the injury was discovered.

"Maryland follows the 'discovery rule' under which 'the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.'" *Jacobs v. Flynn*, 131 Md. App. 342, 361, 749 A.2d 174, 184 (2000) (quoting *Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677 (1981). In *Jacobs*, 131 Md. App. at 362, 749 A.2d at 184 (cleaned up), the

38

court said that a claimant is "charged with notice" and limitations begins to run when he or she has:

> knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.

Defendants argue that Haughie "was on inquiry notice of his claim and knew of his alleged medical injury the moment each medical encounter with each professional ended." ECF 41-1 at 21.  Plaintiff, on the other hand, contends that the limitations period began on the date the brain tumor was discovered, *i.e.*, December 28, 2015.  ECF 42 at 22.

The injury plaintiff claims is not limited to the brain tumor itself.  It is the suffering he experienced from November 11, 2015, when he first reported his symptoms, to when he was sent to the emergency room on December 24, 2015, and the consequences of the delay in diagnosis and treatment.  Construing the facts in the light most favorable to the plaintiff, he was on notice at least as of the date of diagnosis of the tumor -- December 24, 2015.  Accordingly, I conclude that the statute of limitations for Haughie's negligence claim began to run on that date.  His claims are timely.

Defendants argue that, crediting plaintiff's articulation of the standard of care owed to Haughie, he has still failed to state a claim.  They contend that he has not articulated the symptoms of a brain tumor, and, because Haughie had been treated with Neurontin and Fioricet for migraines, "[c]ommon sense indicates that the complaints of headaches and dizziness, especially in a patient already treated for migraines, are not necessarily symptoms of a brain tumor, and generally do not require the care of a specialist." ECF 41-1 at 20.  And, they argue, defendants saw Haughie repeatedly from December 2, 2015, when he first saw Sisay, to his eventual hospitalization on December 24, 2015.  *Id.*  If the standard of care requires follow-up in

one to two weeks, defendants argue, they met that standard. *Id.* Further, they argue that once Haughie exhibited life-threatening symptoms, beginning on December 23, 2015, "he was promptly sent to the emergency department" on December 24, 2015. *Id.*

Plaintiff contends that he has adequately stated a prima facie claim for medical negligence. ECF 42 at 18. In his view, defendants' reliance on his prior medication history is misplaced. *Id.* at 19. And, he argues that the delay in treatment is the cause of his long-term medical issues. *Id.*

I conclude that plaintiff has stated a viable claim for medical negligence. The import of plaintiff's prior medical conditions and his prescription history is an issue for the factfinder. Moreover, plaintiff has alleged that several of the Medical Defendants did not recognize the significance of his symptoms. He also alleges that Dr. Sisay did not make a differential diagnosis and provided no treatment. ECF 40, ¶ 37. And, he points out that he was not taken to see a specialist until about a month after he began presenting with symptoms, with no comprehensive physical workup in the interim. Further, plaintiff has sufficiently pleaded that the delay in treatment of over a month contributed to the long-term injury he suffered. *See, e.g.*, *id.* ¶ 55 ("As a result of the Medical Defendants' failure to accurately diagnose Plaintiff's brain tumor, Plaintiff currently suffers from a long term to permanent difficulty swallowing, walking, and talking.").

Finally, defendants maintain that Haughie has not adequately pleaded a basis for the recovery of punitive damages. ECF 41-1 at 22. They argue: "At most, Haughie's Amended Complaint alleges that the prison medical providers were negligent in failing to diagnose his brain tumor earlier. . . Haughie's Amended Complaint is simply devoid of any factually allegation of the type of conduct required to support an award of punitive damages. . . ."

Haughie contends that in a medical malpractice claim, punitive damages can be "'awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud. . . .'"  ECF 42 at 34 (quoting *Adams v. Coates*, 331 Md. 1, 13, 626 A.2d 36, 42 (1993)).  Plaintiff claims he has provided this factual basis for punitive damages.  ECF 42 at 23.

The Fourth Circuit has said that "no matter what the theory of recovery, punitive damages cannot be recovered absent malice."  *Squal v. BL Ltd.*, 710 F.3d 1027, 1033 (4th Cir. 1983).  *See also Darcar Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 265, 841 a.2d 828, 837 (2004); *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992).  Indeed, under Maryland law, punitive damages may only be awarded in cases of "actual malice," which means ill will, fraud, intent to injure, or evil motive or purpose.  *Tierce Md., Inc. v. Williams*, 381 Md. 378, 414 n.29, 849 A.2d 504, 526 n.29 (2004).

As noted, Haughie has alleged that several of the Medical Defendants failed to record his symptoms.  But, he does not specifically allege that these actions were intentional rather than simply negligent.  At best, he alleges that the Medical Defendants were negligent.  Plaintiff has not articulated a plausible basis for the recovery of punitive damages.

### IV.  Supplemental Jurisdiction

At this juncture, the only remaining claim is the malpractice claim under State law. There is no basis for federal question jurisdiction under 28 U.S.C. § 1331.  Nor do the allegations support diversity jurisdiction under 28 U.S.C. § 1332.

Federal courts are courts of limited jurisdiction.  *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014) (quotation marks omitted) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Thus, a federal district court may

adjudicate a case only if it possesses the "power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 552 (2005) (internal quotation marks omitted).

Notably, "[a] court is to presume . . . that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole,* 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen,* 511 U.S. at 377). Even where no party challenges subject matter jurisdiction, a federal court has "an independent obligation to determine whether subject-matter jurisdiction exists." *Hertz Corp. v. Friend,* 559 U.S. 77, 94 (2010). And, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Hanna,* 750 F.3d at 432.

Congress has conferred jurisdiction on the federal courts in several ways. To provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction over civil actions that arise under the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 1331; *see also Exxon Mobil Corp.,* 545 U.S. at 552; *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *see also* U.S. Constitution Art. III, § 2 ("The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . ."). This is sometimes called federal question jurisdiction.

In addition, "Congress . . . has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens," so long as the amount in controversy exceeds $75,000. *Exxon Mobil Corp.,* 545 U.S. at 552; *see* 28 U.S.C. § 1332. Article III, § 2 of the Constitution permits a federal court to decide "Controversies . . . between Citizens of different States." *Navy Federal*

*Credit Union v. Ltd. Financial Services LP*, ___ F.3d ___, 2020 WL 5014866, at *3 (4th Cir. Aug. 20, 2020). Of relevance here, diversity jurisdiction "requires complete diversity among parties, meaning that the citizenship of *every* plaintiff must be different from the citizenship of *every* defendant." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC,* 636 F.3d 101, 103 (4th Cir. 2011) (emphasis added); *see Strawbridge v. Curtiss,* 7 U.S. 267 (1806).

Under the "well-pleaded complaint" rule, facts showing the existence of subject matter jurisdiction "must be affirmatively alleged in the complaint." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999) (citing *McNutt v. Gen'l Motors Acceptance Corp.*, 298 U.S. 178 (1936)). Put another way, "before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). Moreover, the "burden of establishing subject matter jurisdiction is on . . . the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *accord Hertz*, 599 U.S. at 95; *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010).

The citizenship of the litigants is central when diversity jurisdiction is invoked. *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 663 (4th Cir. 1998). Notably, "state citizenship for diversity jurisdiction depends not on residence, but on national citizenship and domicile." *Id*. (citation omitted). Generally, "the existence of such citizenship cannot be inferred from allegations of mere residence, standing alone." *Id*; *see also Robertson v. Cease*, 97 U.S. 646, 648 (1878) ("Citizenship and residence, as often declared by this court, are not synonymous terms.").

In other words, for "purposes of diversity jurisdiction, residency is not sufficient to establish citizenship." *Johnson v. Advance Am., Cash Advance Ctrs. of S.C., Inc.*, 549 F.3d 932, 937 n.2 (4th Cir. 2008). Rather, a U.S. national is a citizen of the state where the person has his

or her domicile, which "requires physical presence, coupled with an intent to make the State a home." *Id*.

As noted, "the burden is on the party asserting jurisdiction to demonstrate that jurisdiction does, in fact, exist." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). Here, plaintiff has not provided the citizenship of the individual defendants. But, the individual defendants all worked in Maryland, which suggests that at least one of them lived in Maryland. And, if even only one defendant is a Maryland domicile, this would defeat diversity jurisdiction. But, because the record is not clear in this regard, the Court will grant plaintiff an opportunity to establish diversity jurisdiction.

In the absence of diversity, the Court must consider 28 U.S.C. § 1367(a), by which a district court is authorized to resolve state law claims under the grant of supplemental jurisdiction. Pursuant to § 1367(c)(3), however, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

In *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995), the Fourth Circuit recognized that under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." *See also ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012) ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."); *Hinson v. Northwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (stating that, "under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the

44

conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"). *See*, *e.g.*, *Ramsay v. Sawyer Property Management of Maryland, LLC,* 948 F.Supp.2d 525, 537 (D. Md. 2013) (declining to exercise supplemental jurisdiction over plaintiff's state law claims after dismissing FDCPA claims); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F.Supp.2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims.").

When exercising this discretion, the Supreme Court has instructed federal courts to "consider and weigh . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The Court has also said: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

Pursuant to 26 U.S.C. § 1367(c), and the factors set forth in *Carnegie–Mellon*, 484 U.S. at 350, I decline to exercise supplemental jurisdiction over the medical malpractice claim in the Amended Complaint. Although this case has been pending in this Court since December 2018, it has not progressed beyond the motion to dismiss stage. In the absence of diversity jurisdiction, there is no reason for this case to be heard in federal court, rather than in a Maryland State court. *See, e.g., Medina v. L & M Const., Inc.*, RWT–14–00329, 2014 WL 1658874, at *2 (D. Md. Apr.23, 2014) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) ("Finally, as a matter of comity, this Court will remand Medina's state law claims back to state court, as '[n]eedless decisions of state law [by federal courts] should be avoided both as a matter

of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.' ") (alteration in *Medina*).

Assuming that there is no diversity jurisdiction, plaintiff may file his medical malpractice claim in a Maryland court within thirty days following the entry of an Order of dismissal. As Judge William D. Quarles, Jr. explained in *Johnson v. Frederik Memorial Hosp., Inc.*, WDQ-12-2312, 2013 WL 2149762, at *7 n.26 (D. Md. May 15, 2013):

> 28 U.S.C. § 1367(d) provides that, "[t]he period of limitations for any claim asserted under subsection (a) ... shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." *Accord* Md. Rule 2–101(b) ("[I]f an action is filed in a United States District Court or a court of another state within the period of limitations prescribed by Maryland law and that court enters an order of dismissal ... because the court declines to exercise jurisdiction ... an action filed in a circuit court within 30 days after the entry of the order of dismissal shall be treated as timely filed in this State.").

### V.  Conclusion

For the aforementioned reasons, I shall grant the Motion as to Counts I, II, III, IV, and V. I shall dismiss Count VI, without prejudice. And, unless complete diversity is demonstrated, I shall dismiss Count VII, without prejudice.

An Order follows.

Date:  September 17, 2020                         _____/s/_____

Ellen L. Hollander
United States District Judge